NATIONAL DREDGING COMPANY, plaintiff below, appellant, *vs.* THE PRESIDENT, DIRECTORS AND COMPANY OF THE FARM-ERS BANK OF THE STATE OF DELAWARE, defendant below, respondent.

*Writ of Error—Bank—Depositor—Care required of Each—Neg-ligence—Altered Check—Principal or Agent; Authority of—Ratification—Waiver—Evidence—Nonsuit—Bind-ing Instructions.*

1.   In the absence of either prior or subsequent negligence or mis-leading conduct on the part of a depositor, a bank or banker cannot charge the depositor with any payments except such as are made in conformity with his order, for the relation of a bank and its depositors is one simply of debtor and creditor, and it matters not what care is exercised and what precautions are taken by the bank, no payments made otherwise can be charged against the depositor.

2.   Where the erasure of the words "or order" or "the order of" and the insertion of the words "or bearer" in a check without the authority of the depositor making it, results in its payment by the depositor's bank to a person other than the payee, such payment is not payment to the payee—is not payment in conformity with the orders of the depositors and, therefore, the depositor cannot be charged with it.

3.   The object of the depositor's bank-book or pass-book is to in-form him from time to time of the condition of his account as it appears on the books of the bank.   The sending of his pass-book to be written up and returned with the vouchers is in its effect a demand to know what the bank claims to be the state of his account, and the returning of the book with the vouchers is the answer to the demand, and imports in effect a re-quest by the bank that the depositor will in proper time examine the ac-count so rendered and either sanction or repudiate it.   The depositor can-not, therefore, without injustice to the bank omit all examination of hi account when rendered at his request.   His failure to make it or have is made within a reasonable time after opportunity given for the purpose it inconsistent with the object for which he obtains and uses his pass-books

4.   Where a suit is brought by a depositor to recover from the bank money deposited by him, which the bank has paid out otherwise than in conformity with his orders, and the bank sets up the defense that it is nevertheless entitled to charge the depositor with such payments because of the conduct of the depositor subsequent to such payment, the pre-liminary question to be determined is whether the bank was or was not guilty of negligence in making the payment.   If it were negligent, if it officers be found to have failed to exercise due and reasonable care in de ,  ,

tecting the forgery, or fraud, then the negligence of the depositor, his failure to perform his duty in examining his pass-book and vouchers with reasonable care and report to the bank within a reasonable time any errors or mistakes would constitute no defense.

5. Where a suit is brought by a depositor to recover from a bank payments made on forged or fraudulently altered checks, which constitute a series of successful forgeries, *held*; that after the depositor's pass-book has been balanced and returned to him with any of the forged or fraudulently altered checks, and it appears that there was no negligence or want of due and reasonable care on the part of the bank in paying the said forged or fraudulently altered checks, the failure of the depositor to notify the bank within a reasonable time that such checks have been forged or fraudulently altered, will, if the delay be caused by his negligence in not using due care and diligence in examining the pass-book and vouchers, or in giving notice, if he had discovered the forgeries, constitute a defense for the bank to the depositor's suit for money subsequently paid out on similar checks.

6. With respect to the payments made before such settlement, however, where a depositor has failed in his duty in respect to the examination of his pass-book and vouchers with reasonable care and diligence, *held*; that in the absence of negligence or want of due and reasonable care on the part of the bank in making such payments, the depositor becomes liable to the bank for all damages sustained by the bank in consequence of such omission of duty. The extent of the liability of the depositor is commensurate with the loss sustained by the bank in consequence of his neglect of duty, no more, no less.

7. Neither the doctrine of ratification nor estoppel can be invoked, but the damages sustained by the bank as a result of the neglect of duty by the depositor are susceptible of proof and measurement as in any other case of breach of duty imposed by contract.

8. As to all the subsequent payments, the bank is entitled to invoke the equitable doctrine of estoppel. As to these it may be fairly said the bank was induced to pay and did pay in consequence of the silence of the plaintiff when it was his duty to speak. The bank was misled to its injury by the fault of the depositor.

9. Where the acts and conduct and methods of conducting business, or filling up of checks on the part of a depositor were such as to warrant a bank in paying forged or fraudulently altered checks, *held*; that such conduct on the part of the depositor was the proximate cause of the loss and the bank is not liable for payments made on such checks.

10. Where forged or fraudulently altered checks have been paid and charged in the account returned to a depositor, he is under no duty to the bank so to conduct the examination that it will necessarily lead to the discovery of the fraud. If he examines the forgeries personally and he is

himself deceived by the skillful character of the forgery, his failure to discover it will not shift upon him the loss which in the first instance is the loss of the bank.

11.   Where the fraudulent alterations of the checks, for the payment of which suit is brought by the depositor, were apparent, and it is obvious that if the treasurer of the depositor, a dredging company, had at any time looked over the checks or vouchers returned with the pass-book, their alteration to "or bearer" would have stared him in the face and disclosed the fraud at once; and where it is admitted that he did not look over them, but assigned the duty to the secretary of the company, depositor, who was himself the perpetrator of the fraud, *held*; that no question of fact arises in regard to what amount of diligence was exercised or required by the plaintiff in order to detect the forgeries, and that inasmuch as it is apparent that any, even a cursory examination by an honest clerk or employee would have discovered the alterations, therefore, although the knowledge of the forgeries possessed by the secretary, from the fact that he himself was the forger, to whom the examination was entrusted, is in no respect to be attributed to the dredging company. yet it is chargeable with such knowledge as an examination of the checks would have imparted to an honest clerk or employee previously unaware of the forgeries. And as it would have been chargeable with negligence or failure of such clerk or employee to discover and report such palpable alterations,it must be equally chargeable with the default of its secretary.   Its position may be no worse because of the knowledge possessed by the forger, *qua* forger, but it can be no better off.

12.   Where the depositor, a dredging company, whose business was conducted in different parts of the United States, widely remote from each other, had its chief place of business and office in the city of Wilmington, Delaware, where was situated the bank which was its sole depository and banker, and the secretary of the dredging company made all the deposits and filled up all the checks of the company, which the treasurer signed, and, under a by-law of the company, was alone authorized to sign, which by-law was known to the bank; and the secretary fraudulently altered checks filled up and sent by him to the treasurer, who signed and returned them to him for distribution, by striking out the words "or order" or "to the order of" in the checks, and inserting the words "or bearer" in such a manner that the alterations were plain and palpable, so as to indicate that they were made after the checks were made out and signed, and got the cash on those checks; and where there was furthermore evidence that such alterations excited the suspicions or curiosity of the bank officers sufficiently to cause them to ask why they were made, and the only reason given by the secretary who got the money was that "The payee desired the currency," *held*; that it was not for the Court to say whether the evidence bearing upon the question of the negligence or want of due and reasonable care on the part of the bank in the payment of the altered checks was strong or weak, when taken in connection with other evidence tending to show that the method in which the business of the dredging company was conducted was such as to justify the officers of the bank in believing that the secretary was authorized to so alter checks and get the money

on them was such conduct as was calculated to mislead the bank, and so facilitate the perpetration of the fraud and constituted the proximate cause of the loss, but that the evidence should go to the jury under careful instruction from the Court.

*(May* 6, 1908.)

NICHOLSON, CHANCELLOR, and GRUBB and PENNEWILL, J. J., sitting.

*Anthony Higgins and William S. Hilles* for plaintiff.

*Herbert H. Ward* and *Henry Ridgely, Jr.* for respondent.

Supreme Court adjourned, January Term, 1908.

Writ of Error

NICHOLSON, CH., delivering the opinion of the Court:

This was an action of assumpsit in the Superior Court for New Castle County, brought by the National Dredging Company, plaintiff in error, as plaintiff below, against the Farmers' Bank to recover an alleged balance of account.

The plaintiff's bill of particulars contained an itemized list of the deposits made by the plaintiff with the defendant, subject to check, from February, 1897, to April 2, 1903, amounting in the aggregate to one million, nine hundred and fifty-one thousand, eight hundred and twenty-three dollars and forty-two cents ($1,951,823.42), and a list of checks alleged by the plaintiff to be wrongfully charged by the defendant to the account of the plaintiff within the same period, amounting in the aggregate to thirty-one thousand, five hundred and six dollars and eighty-six cents ($31,506.86).

A motion for a nonsuit was submitted by counsel for the defendant at the close of the plaintiff's testimony and was granted by a majority of the Court. Counsel for the plaintiff refused to take a nonsuit, and a majority of the Court thereupon directed the jury to return a verdict for the defendant.

SPRUANCE, J., delivered a dissenting opinion, saying in conclusion, "with proper instructions from the Court as to the law,

I believe that a more just and satisfactory result would be reached by the verdict of the jury, than by the determination of both facts and law by the Court."

The assignment of errors was as follows:—

"1. That the Court erred in directing the jury to return a verdict for the defendant in the above stated cause.

"2. That upon the refusal of the plaintiff to accept a nonsuit in the above entitled cause, the Court erred in charging the jury as follows:

'For the reasons which the majority of the Court gave in their decision to grant a nonsuit in this case, we direct you to return a verdict for the defendant.'

"3. That the Court erred in not submitting to the jury, under the testimony adduced on the part of the plaintiff, and contained in the Bill of Exceptions, the question as to whether the defendant was indebted to the plaintiff in the said action."

Obviously, it will be necessary to consider the evidence in detail, in order to arrive at a correct understanding of the question presented to this Court, but a general preliminary outline of the facts in the case may be best given by quoting from the opinion of the learned Chief Justice in the Court below, as follows:

"In disposing of this motion for a nonsuit we will first briefly summarize the facts disclosed by the testimony of the plaintiff.

"The National Dredging Company, the plaintiff, is a corporation of the State of Delaware, and during the time covered by this suit, was engaged in operations and in work in different parts of the United States, involving the expenditure of large sums of money. The Farmers' Bank at Wilmington, the defendant, is also a corporation of this State engaged in the banking business; and during the time above named was the depository and banker for the said company.

"The chief place of business and office of the company was in the City of Wilmington; as was also the banking house of the defendant.

"From February 23, 1897, to January 14, 1903, the company had on deposit with the bank subject to check a large sum of money, amounting to nearly two millions of dollars. This amount has been properly paid out by the bank upon checks of the company, except the sum of thirty thousand eight hundred and thirty-one dollars and fifty-two cents. This amount the company claims was wrongfully paid by the bank upon altered or forged checks, which are one hundred and fourteen in number, and extend from July 7, 1897, the date of the first, to December 17, 1902, the date of the last of the disputed checks, as disclosed by the plaintiff's bill of particulars.

"The money of the company was deposited from time to time in the bank by William H. Churchman, who was the secretary of the company, in charge of its office and its representative in this city. All such deposits were entered upon the bank pass books of the company, which book the company kept. The money so deposited was paid out only upon checks signed by the treasurer, who was George G. Barker. The pass book was written up and settlements made, and the company's balance in the bank ascertained, twelve times during the period covered by this controversy, as follows, viz., June 14, August 28 and December 22, 1897; August 6, 1898; August 4, 1899; August 11 and November 8, 1900; June 9, March 1, November 11 and December 11, 1901; and January 14, 1903.

"At each one of these settlements the checks theretofore paid by the bank were surrendered and delivered with the pass book to William H. Churchman, and remained in the possession of the company up to the commencement of this action. The first two of the disputed checks, dated respectively July 7 and August 8, 1897, were so delivered in the second settlement of August 28, 1897. Like deliveries of the disputed checks were so made in each of the succeeding settlements and so remained in the possession of the company.

"All the disputed checks were signed by the treasurer George G. Barker. The alterations or forgeries consisted in

drawing two lines through the words 'the order of,' before the name of the payee in each check, and in writing after the name of the payee the words 'or bearer.' It is alleged that these alterations were made after the checks were signed, and without authority. The handwriting in the body of all the checks, except six, is that of William H. Churchman, the secretary of the company. The remaining six are either in his handwriting or in that of some one in the office under him.

"The method of the company in paying its bills seems to have been this: the secretary, William H. Churchman, received the bills, filled out the checks, and sent them to George G. Barker, the treasurer, wherever he might be from time to time. The checks were signed by the treasurer and returned to Churchman for distribution among the creditors.

"With respect to this bank account,the evidence shows that William H. Churchman, the secretary, made the deposits; kept the bank book at the office of the company in this city; had the book settled from time to time; received the checks surrendered by the bank at such settlements. It is proved that all the money paid out by the bank on these altered checks was paid to the said William H. Churchman, personally, who was not only the Secretary of the company, but under the by-laws of the company, in the absence of the president and vice president, acted as president.

"The company claims that the alterations of those checks were so manifest upon the face of the check itself, by reason of the different ink used, the manner and place of the additions to the checks and the character of the same, that the bank was grossly negligent in paying them. The company claims, therefore, that it is entitled to recover in this action, even though there may have been negligence on its part in not sooner discovering and notifying the bank of the alterations."

The bank claims, on the other hand, that the course of conduct and the business methods of Barker, the president and treasurer of the plaintiff company (depositor), in connection

with the transactions in controversy, as disclosed by the testimony of the plaintiff, constituted such gross negligence and so misled the bank as to relieve the defendant from all responsibility from the loss occasioned by its payment of the altered checks to Churchman.

This defense is formulated by counsel in the three following paragraphs:—

"*First*.  Our first point is therefore that plaintiff cannot recover because its prior or original negligence occasioned the loss in question.

"*Second*.  Our second point is therefore that plaintiff was guilty of gross negligence subsequent to the payment of the several checks in question by the bank.

"*Third*.  Our next contention is that the acts and conduct of plaintiff company warranted defendant bank in believing that William H. Churchman was authorized to make the alterations appearing on the checks in controversy."

There is no question of fraud or intentional misconduct on the part of either the plaintiff or defendant, but in order to determine which of the parties to the suit must bear the loss resulting from the crime of William H. Churchman, it is, of course, necessary for the issues of negligence, which are presented, to be decided; and the question for this Court to determine is whether it was proper for the Court below, under the evidence before it, to withdraw the case from the jury.

In the absence of either prior or subsequent negligence or misleading conduct on the part of a depositor, a bank or banker cannot charge the depositor with any payments, except such as are made in conformity with his orders, for the relation of a bank and its depositors is one simply of debtor and creditor, and it matters not what care is exercised and what precautions are taken by the bank, no payment made otherwise can be charged against the depositor, even though it be made in consequence of forgeries so skilfully executed as to deceive the most expert, or

by false pretenses so adroit and plausible as to be likely to impose upon experienced bank officers.

These are the fundamental principles which are either formulated or implied in the discussion of every well considered case that involves the question whether upon the given state of facts it is the bank or its depositor which must bear the loss resulting from successful forgery and fraud. *Leather Manufacturer's Bank vs. Morgan*, 117 *U. S.* 96, 106; *Shipman vs. Bank S. N. Y.*, 126 *N. Y.* 318, 327.   In the latter case the Court say, after alluding to these principles,—"These rules are so familiar and so well established and illustrated by the adjudged cases that a bare reference to them is all that is needful here.   (*Crawford vs. West Side Bank*, 100 *N. Y.* 53; *Aetna Nat. Bank vs. Fourth Nat. Bank*, 46 *id.* 86; *Corn Exchange Bank vs. Nassau Bank*, 91 *id.* 80; *Phoenix Bank vs. Risley*, 111. *U. S.* 125; *Bank of British North America vs. Merchants' Nat. Bank*, 91 *N. Y.* 106; *Marine Bank vs. Fulton Bank*, 2 *Wallace* 256; *First Nat. Bank vs. Whitman*, 94 *U. S.* 347; *Citizens' Nat. Bank vs. Importers and Traders' Bank*, 119 *N. Y.* 195.)"

It is also clear (as a general principle, and in the absence of negligence on the part of the depositor) that when the erasure of the words "or order" or "the order of" and the insertion of the words "or bearer" in a check without the authority of the depositor making it, results in its payment by the depositor's bank to a person other than the payee, such payment is not payment to the payee—*is not payment in conformity with the orders of the depositor*, and therefore the depositor cannot be charged with it.

This rule is familiar and obvious, but reference may be had to a couple of Massachusetts cases directly in point.   *Belknap, et al. vs. National Bank of North America*, 100 *Mass.* 376, 381; *Dana vs. National Bank of the Republic*, 132 *id.* 157.

There is one other well settled principle, a statement of which seems necessary in order to supplement the two already set forth, and as tending to shorten and facilitate the discussion of

N'T'L DREDGING CO. vs. FARMERS BANK.    589

OPINION.

the disputed questions before us, which have been so ably and exhaustively argued by the eminent counsel engaged in this cause.   It is stated by Justice Harlan, as follows:—

"While it is true that the relation of a bank and its depositor is one simply of debtor and creditor, (*Phoenix Bank v. Risley*, 111 *U. S.* 125, 127,) and that the depositor is not chargeable with any payments except such as are made in conformity with his orders, it is within common knowledge that the object of a pass-book is to inform the depositor from time to time of the condition of his account as it appears upon the books of the bank.   It not only enables him to discover errors to his prejudice, but supplies evidence in his favor in the event of litigation or dispute with the bank.   In this way it operates to protect him against the carelessness or fraud of the bank.   The sending of his pass-book to be written up and returned with the vouchers, is, therefore, in effect, a demand to know what the bank claims to be the state of his account.   And the return of the book, with the vouchers, is the answer to that demand, and, in effect, imports a request by the bank that the depositor will, in proper time, examine the account so rendered, and either sanction or repudiate it.   In *Devaynes v. Noble*, 1 *Meriv.* 530, 535, it appeared that the course of dealing between banker and customer, in London, was the subject of inquiry in the High Court of Chancery as early as 1815.   The report of the master stated among other things, that for the purpose of having the pass-book 'made up by the bankers from their own books of account, the customer returns it to them from time to time as he thinks fit; and, the proper entries being made by them up to the day on which it is left for that purpose, they deliver it again to the customer, who thereupon examines it, and if there appears any error or omission, brings or sends it back to be rectified; or, if not, his silence is regarded as an admission that the entries are correct.'   This report is quite as applicable to the existing usages of this country as it was to the usages of business in London at the time it was made.   The depositor cannot,

therefore, without injustice to the bank, omit all examination of his account, when thus rendered at his request. His failure to make it or to have it made, within a reasonable time after opportunity given for that purpose, is inconsistent with the object for which he obtains and uses a pass-book." *Leather Manufacturers' Bank v. Morgan*, 117 *U. S.* 96, 106—7.

The majority of the Court below based its peremptory instructions to the jury to return a verdict for the defendant upon the assumption that the company plaintiff had failed to perform this duty, and was thereby guilty of subsequent negligence, the effect of which was to defeat its right to recover from the bank. The Chief Justice said:—

"The payment of these alleged altered checks by the bank commenced in June 1897, and continued until December, 1902. The checks are 114 in number. They were regularly charged against the account of the company by the bank, and the amounts so charged with the altered checks themselves as vouchers were returned to the company in ten separate settlements during that period of time. With such evidence in its possession no examination of the accounts and vouchers was made or attempted to be made by the company, until after the death of Churchman, the secretary, in January, 1903.

"It seems therefore to a majority of the Court under the circumstances of this case, that the negligence of the plaintiff company was so gross, as to defeat its right to recover in this suit as a matter of law, and that we would not be justified in submitting the facts to be determined by the jury."

BOYCE, J., concurring, concludes as follows:

"This case as it now stands before us (the plaintiff having disregarded its duty to the bank for upwards of five years) has passed beyond the stage in the transactions between the plaintiff and the bank where the alleged negligence of the bank in the payment of the altered checks might be a question of fact for the jury, had the plaintiff exercised reasonable diligence both

N'T'L. DREDGING CO. vs. FARMERS BANK.    591

OPINION.

to discover the alterations and consequent forgeries of the checks in question and to give notice thereof to the bank."

Assuming that the Court below was correct in thus determining the fact of subsequent negligence on the part of the plaintiff company (depositor), it still remains for us to consider whether it was also correct in its determination of the legal effect of such negligence.

SPRUANCE, J., in his dissenting opinion quotes upon this point the language of Justice Harlan, who delivered the opinion in *Leather Manufacturers' Bank vs. Morgan*, cited above, as follows:

"Of course, if the defendant's officers, before paying the altered checks, could by proper care and skill have detected the forgeries, then it cannot receive a credit for the amount of these checks, even if the depositor omitted all examination of his account."

If this is a correct statement of the law, such subsequent negligence on the part of the depositor is not a bar to recovery, unless it be also determined that there was no negligence on the part of the officers of the bank in paying the fraudulently altered checks, and, therefore, Judge Spruance is correct when he states elsewhere in his opinion, "The first and important question is whether there is any evidence that would warrant the jury in inferring and finding that the bank did not use due and reasonable care and diligence to discover that these checks or some of them had been fraudulently altered."

In every case where suit is brought by a depositor to recover from a bank money deposited by him, which the bank has paid out otherwise than in conformity with his orders, and the bank sets up the defense that it is nevertheless entitled to charge the depositor with such payments, because of conduct of the depositor subsequent to such payment, the preliminary question to be determined is whether the bank was or was not guilty of negligence in making the payments.   If it were negligent, if its officers be found to have failed to exercise due and reasonable

care in detecting the forgery or fraud, then the subsequent negligence of the depositor, his failure to perform his duty in examining his pass-book and vouchers with reasonable care and report to the bank in a reasonable time any errors or mistakes, would constitute no defense.

It is needless to cite cases in which this doctrine is explicitly stated, because they are all in accord upon this point, and the doctrine is assumed in every case where it is not stated. It is not disputed by counsel for the defendant, and, in fact, is indisputable, being recognized in all the authorities, however much they may differ otherwise in the doctrines they apply to the questions arising in consequence of subsequent negligence on the part of depositors.

Most of the cases cited, in fact the majority of the suits brought by depositors to recover payments made on forged or fraudulently altered checks, result from the crimes of some trusted employee of the depositor, and usually the Court has to deal with a long series of successful forgeries, as in the present case.

After his pass-book has been balanced and returned to a depositor with any of the forged or fraudulently altered checks, the authorities practically agree that in the absence of negligence on the part of the bank the failure of the depositor to notify the bank within a reasonable time that such checks have been forged or fraudulently altered, will, if the delay be caused by his negligence in not using due care and diligence in examining the pass-book and vouchers, or in giving notice, if he had discovered the forgeries, constitute a defense by the bank to the depositor's suit for the money subsequently paid out on similar checks.

With respect to the payments made before such settlement, however, the authorities differ, and although in the greater number of cases no distinction is made, in others, a different principle is held to apply and the distinction is insisted upon with force and earnestness in the case of *Critten vs. Chemical*

*National Bank*, 171 *N. Y.* 219, 229.   The Court in that case con-
cludes its consideration of this point, as follows:—

"This question is well discussed by the Supreme Court of
Alabama in the case of *National Bank vs. Allen, supra,* and we
concur in the view expressed by that Court, that the liability
of the depositor for neglect of his duty to examine and verify
his account with the bank is limited to damages sustained by
the bank in consequence of such neglect."

In the Alabama case referred to, the pleas of the bank
state facts showing that it acted with due care in the payment
of the forged checks, and averred subsequent negligence on the
part of the plaintiff in the examination and comparison of its
pass-book, check stubs and returned checks.   A demurrer to these
pleas was overruled and the case tried by the Court below with-
out the intervention of a jury.   It appeared that the forgeries
were so skilfully executed as to deceive even the plaintiff him-
self, and it was assumed throughout the opinion of the Court
that there had been no want of due care, caution and diligence
on the part of the officers of the bank in their scrutiny and
consideration of the forged checks before paying them.

The Alabama Court discusses the principles applicable to
payments made before settlement, as follows:—

"Some of the Courts have held that if injury results to
the bank by the negligence of the depositor, he will be held to
have adopted and ratified the payment of the forged checks.

"By others under like circumstances the doctrine of estop-
pel has been applied, and the depositor held to be estopped
from asserting a claim to the money paid on the forged checks.
We do not think that either the doctrine of ratification or es-
toppel can be applied as a just and equitable principle in all
cases.   Ratification refers to a past act or transaction, and
as now being considered, refers to the unauthorized act of an
agent, or the adoption of a past act or transaction as his own
act, made or executed by another who was not an agent.   It
would strain the doctrine of ratification to hold that a person had

ratified or adopted as his own the unauthorized act of another, of which he had no information, or which was promptly repudiated as soon as brought to his knowledge. So where a bank pays a forged check drawn in the name of one of the depositors, and the depositor is wholly free from neglect or fault, the bank owes the amount to the depositor. There was no act, omission to act, or silence in such a case on the part of the depositor which induced the bank to pay the forged check, or influenced the action of the bank in the payment of the check. No principle of the law or of estoppel can be invoked by the bank against the depositor under such circumstances. The depositor owed the bank a duty which was to examine the pass-book and vouchers with reasonable care and diligence. If the depositor failed in his duty in this respect, and the bank was injured in consequence of such omission of duty, the depositor became liable to the bank for all damage. The extent of the liability of the depositor is commensurate with the loss sustained in consequence of his neglect of duty, no more, no less. It would be unjust, unfair to the depositor, not sanctioned by any correct principle of law, to permit the bank to invoke the doctrine of ratification or estoppel which would exempt the bank from all liability incurred by its own neglect in the payment of the forged check, and in many cases inflict upon the depositor greater loss than that caused to the bank by his neglect of duty. The damages sustained by the bank as the result of neglect of duty by the depositor, are susceptible of proof and measurement, as arise in any other case of breach of duty imposed by contract. The pleadings may be framed to present the issue in a proper manner." *First National Bank of Birmingham vs. Allen,* 100 *Ala.* 476, 484.

With respect to payments made after the settlement, the true reason of the generally adopted rule is admirably stated, as follows (it being assumed, of course, that there was no negligence on the part of the bank):

"The evidence shows that several checks were forged by Tomlin and paid by the bank subsequent to the time that Allen

the plaintiff was chargeable with notice that his clerk was making such unauthorized use of his name. As to all such subsequent payments of forged checks the bank is entitled to invoke the equitable doctrine of estoppel. As to these it may be fairly said the bank was induced to pay and did pay in consequence of the silence of the plaintiff when it was his duty to speak. The bank was misled to its injury, by the fault of the depositor. A very interesting and instructive collection of leading cases on the questions under consideration may be found in the 26th *Volume* of *Amsrican Law Review* for March and April, 1892, page 274."

*First National Bank of Birmingham vs. Allen, supra.*

Both the reasoning and conclusions of the Alabama Court meet with our unqualified approval, and we do not deem it necessary to give further consideration to the doctrine of ratification and estoppel in this connection. We do not consider that they apply to the payment of forged checks prior to the settlement,and our views in respect to such payments are in accord with those of the New York and Alabama Courts.

*The Leather Manufacturers' Bank vs. Morgan, supra,* is the most notable case in opposition to these views. It was decided in 1885, about eight years before the Alabama case we have cited, and about seventeen years before the New York case. The opinion delivered by Justice Harlan, from which we have already quoted, is long, elaborate and painstaking, reviewing nearly all the leading authorities up to that time bearing upon all the leading questions at issue in this cause.

Upon the particular point we are now considering, however, the reasoning upon which he rests, is contained in the following paragraph:—

"If he had discovered that altered checks were embraced in the account, and failed to give due notice thereof to the bank, it could not be doubted that he would have been estopped to dispute the genuineness of the checks in the form in which they

were paid; upon the principle stated by Lord Campbell in *Cairn-cross v. Lorimer*, 3 *Macq.* 827, 830, that 'if a party having an interest to prevent an act being done, has full notice of its having been done, and acquiesces in it, so as to induce a reasonable belief that he consents to it, and the position of others is altered by their giving credit to his sincerity, he has no more right to challenge the act to their prejudice than he would have had if it had been done by his previous license.' This, however, could not be, if, as claimed, the depositor was under no obligation whatever to the bank to examine the account rendered at his instance, and notify it of errors therein in order that it might correct them, and, if necessary, take steps for its protection by compelling restitution by the forger. But if the evidence showed that the depositor intentionally remained silent, after discovering the forgeries in question, would the law conclusively presume that he had acquiesced in the account as rendered, and infer previous authority in the clerk to make the checks, and yet forbid the application of the same principle where the depositor was guilty of neglect of duty in failing to do that, in reference to the account, which he admits would have readily disclosed the same fraud? It seems to the Court that the simple statement of this proposition suggests a negative answer to it."

    *Leather Mfrs'. Bank vs. Morgan, supra.*

    In other words, no difference in legal effect is recognized between the concealment of a forgery on the part of the depositor with deliberate intention and actual knowledge of the fact, on the one hand, and, on the other, his neglect to use the due and reasonable care and diligence in the examination of his pass-book and vouchers, which might have enabled him to discover it.

    This argument does not carry conviction to our minds, for the former instance necessarily imports a deliberate ratification by the depositor of the forgeries, which, as in any other case of deliberate ratification, would be conclusive against him; whereas in the latter instance, for reasons already quoted from the Al-

abama case, ratification cannot be implied, and an analysis of the proposition quoted from Lord Campbell shows that it is not applicable to facts and conduct so essentially different.

The New York Court in *Critten vs. Chemical National Bank* refers to the Courts taking the opposite view of this point, as follows:—

"In the cases cited from the Supreme Court of the United States, from that of Massachusetts and that of Pennsylvania, it is conceded that, if the bank has been guilty of negligence in paying the forged checks, then the doctrine of ratification and estoppel does not apply. It seems to us that the exception is somewhat inconsistent with the principle on which the doctrine rests. Moreover, we see no reason why the bank should be entitled to anything more than indemnity for the loss the depositor's negligence has caused it."

This question may not be of great importance in this case, so far as practical results are concerned, but it is none the less necessary for us to pass upon it, and we have, therefore, given to it most careful consideration, and we have deemed it proper to elaborate the general principles governing the relation of bankers and their depositors in view of the fact that this is the first case which has arisen in this State involving those principles.

We are now brought to the consideration of the important question whether there was any evidence that would have warranted the jury in inferring and finding that the bank did not use due and reasonable care and diligence to discover that the checks in controversy, or some of them, had been fraudulently altered.

The alterations of the checks, making them payable to bearer, were not claimed by the defendant to be other than patent, and there was evidence that in most of the checks after the name of the payees, room was not left in which to write the words "or bearer" without deflecting or crowding them, and that those words were evidently written in different ink than the balance of the check and at a different angle of writing, thus tending to

raise the inference, although not conclusively, that the alterations were made after the signature, at the very least, it was sufficient to excite in the minds of the bank officers the suspicion that such was the case.

It also appeared from the evidence that the money was not paid on such altered checks to the payee, but to Churchman, who presented the checks, and got the money, and that the alteration in every instance was made in his hand-writing.

There was also evidence that the suspicion or curiosity of the bank officers was sufficiently aroused to cause them to ask of Churchman an explanation, and that the only explanation given by him was that "the people for whom these checks were drawn, in whose favor these checks were drawn, wanted the currency."

It also appeared by the by-laws of the company that no one but the treasurer had the authority to sign checks; and that sometime prior to the payment of the checks in controversy Mr. Barker, the treasurer, had shown to Mr. Robinson, an officer of the bank, the following by-law:—

"Article 11. The Treasurer of the company shall have charge of the funds of the company; shall deposit them in such bank to the credit of the company, as the directors may designate, and shall make payment only by checks, the stub of which shall state for what purpose the check is drawn."

The occasion being, that the bank had paid a check signed by Mr. Coulton, at that time the president of the plaintiff company and after being shown the by-law the bank officers "promised not to do it any more."

All the checks altered in this way, that were paid to Churchman prior to the first balancing of the company's pass-book that contained any of the altered checks, were made to H. H. Ferguson, and there is evidence tending to show that he was known by the bank officers to be an employee of the company, and had been receiving checks payable to his order shortly before the date of such altered checks, at Mobile, Alabama.

It also appears that up to and inclusive of May 3, 1899, checks made payable to his order were the only ones altered.

Can it be contended that the inference might not be properly drawn by a jury from· this evidence considered by itself, that the bank officers did not use due and reasonable care and diligence in paying the checks, thus patently altered, to the secretary of the company, living in Wilmington and in whose handwriting the alterations were made?   It seems also apparent that if such inference should be drawn by a jury, it would follow that Churchman's success in successfully continuing a series of such forgeries would be as fairly attributable to the folly of the bank in paying those checks without making inquiry as to the authority for the alteration, as to any carlessness of the plaintiffs in failing to detect the alteration when the checks were returned to it from the bank; and upon the established principles which we have already laid down, such subsequent negligence on the part of the plaintiff could not release the bank from its responsiblity for any of the payments made on *such* altered checks. On the other hand, there is evidence tending to show, although not conclusively, that the method in which the business of the plaintiff company was conducted was calculated to  mislead the bank and justify its officers in believing that Churchman, its secretary, was authorized to make the alterations and receive the money instead of the payees.   This is the third contention made by the defendant's counsel, which we have quoted above, to wit:

"That the acts and conduct of plaintiff company. warranted defendant bank in believing that William H. Churchman was authorized to make the alterations appearing on the checks in controversy."

The evidence which is claimed by the bank defendant to have proved this, is that Churchman was not a mere clerk of the company, but its secretary, and in the absence of the president and vice president, its acting president; that the sole office of the plaintiff company in the City of Wilmington was manage d

by him; that with rare exceptions he alone dealt with defendant in relation to its bank account, endorsing all its checks for deposit, with the exception of government checks, which were endorsed by the treasurer and sent to Churchman for deposit; that Barker, the treasurer, is shown to have been in the city of Wilmington but two or three times in a year, and his duty to the company required him to be in remote parts of the country, now on the New England coast, now on the Alabama, Florida, or Texas coast, so that if they desired to notify him of the alterations it might have taken days to have located him in order to send a description of the checks. This had been the case for some years prior to the date of the first altered check in controversy, and it is argued that all these circumstances were calculated to give the bank the assurance that it would be justified in making the payments to Churchman on such altered checks, especially in view of the fact that by delaying payment in order to make inquiry of Barker they might have shaken plaintiff's credit, causing great damage and subjecting itself to an action of damages, besides gaining the hostility of both Churchman and Barker and losing this valuable account, in case the suspicion proved to be unfounded.

It is also contended by the defendant's counsel that Barker's conduct, as appears from the evidence, in signing the checks sent him by Churchman upon Churchman's statement that they were for *bona fide* bills, without verifying his statement by demanding the O. K'd. bills for payment of which Churchman stated the checks were drawn, or asking for the receipted bills, afterwards furnished facilities for Churchman to successfully perpetrate the frauds, which renders this case analogous to the famous Vagliano case, finally decided against the plaintiff by the House of Lords. *Bank of England, Appellant, vs. Vagliano Bros.*, 1891 *App. Cas.* 171, 172.

It was heard in the House of Lords on appeal from the judgment of the Court of Appeals, reported 23 *Q. B. D.* 243; 58 *L. J. Q. B.* (357), in which the judgment of Charles, J., reported

22 *Q. B. D.* 103; 58 *L. J. Q. B.* 27; was affirmed by Cotton, L. J., Lindley, L. J., Bowen, L. J., Fry, L. J., and Lopes, L. J.; *dissentiente*, Lord Esher, M. R.     The facts are briefly stated in the report, as follows:—

"The plaintiff in the action claimed to be entitled to be credited by the defendant bank with a sum of £71,500 with which the bank had debited him in respect of certain bills, which bore the genuine signature, as acceptors, of the plaintiff's firm. The bills purported to be drawn by one Vucina, who was a correspondent of the plaintiff's firm, but they were in fact wholly fictitious bills fabricated by a clerk in the employ of the plaintiffs, who by placing them before Mr. Vagliano along with forged letters of advice obtained the acceptance of the firm. The payee named in the bills was 'Petridi'. There was a person of this name who had some business with the firm, but this person had no concern with the transaction. After obtaining the acceptance of the firm, the clerk forged the signature of the payee and obtained payment of the bills at the counter of the bank. Both the Courts below had decided in favour of the plaintiff's claim against the bank."

Each of the eight Lords participating in the decision delivered an opinion, Lords Bramwell and Field dissenting, and the others held partly that the payee was fictitious or non-existent within the meaning of the English Bill of Exchange *Act*, 1882, *Sec.* 7, *sub. sec.* 3, which made bills of exchange payable to bearer, which were drawn payable to a fictitious or non-existing person; and partly that there was a want of due care and diligence on the part of the plaintiffs in the conduct of their business and the scrutiny of their accounts with Vucina &c., which constituted the proximate cause of the payment of the forged checks.

All the Judges, however, took occasion to cite with approval the leading case of *Robarts vs. Tucker*, 16 *Q. B.* 560, and the only question of law decided by them was the meaning and effect of the words "fictitious or non-existing persons" as used

in the English Bill of Exchange Act; their opinions, so far as they dealt otherwise with the question of plaintiff's negligence as the proximate cause of the loss, being concerned merely with the application of an undisputed principle to the particular state of facts before them.

The opinions delivered in all three courts are extremely interesting, and we have read them with great care. Counsel for the defendant in this cause have displayed great ingenuity in the effort to make the doctrine applied by the House of Lords to the bogus bills of exchange in that case, about which everything was forged and fictitious except Vagliano's acceptance, to checks signed by Barker for bills which had already been paid by other checks to the same payees, or for sums of money which were not at the time due and owing to the payee, in every instance being persons with whom the company had had habitual dealings. The analogy fails, however, not only because of the radical difference in the facts and circumstances of the Vagliano case, but also because that case was concerned with bills of exchange, which differ in some essential feature from checks, being a distinct species of the same genus of commercial paper.

The case of *Scholfield vs. Earl of Londesborough*, 1896 *App-Cas.* 514, 550, which also discusses *Robarts vs. Tucker* and *Young vs. Grote*, as well as the Vagliano case, is much more instructive in its theoretical discussion of the general principles of law governing bills of exchange.

Out of the great number of cases cited and reviewed by counsel, we have only referred to those which formulate or illustrate the principles of law involved. The greater number are only concerned with the application of admitted principles to the facts or circumstances before the Court at the time which are necessarily set out at length. These we have deemed it unnecessary for the most part to cite.

We have already discussed the questions arising from the subsequent negligence of depositors, and stated the principles which determine its effect upon the responsibility of the bank

for money paid out on forged or altered checks, both before and after a settlement of the depositor's account containing any of such checks.

For the purpose of that discussion we assumed that a majority of the Court below were correct in assuming that such negligence had been proved in the pending cause, and it still remains for us to consider whether in our judgment such an assumption was warranted by the evidence.

The general principle is that "where forged checks have been paid and charged in the account and returned to the depositor, he is under no duty to the bank so to conduct the examination that it will necessarily lead to the discovery of the fraud. If he examines the vouchers personally and is himself deceived by the skillful character of the forgery, his omission to discover it will not shift upon him the loss which in the first instance is the loss of the bank."

In the cause before us, however, no such difficulty is presented: no question arises as to the amount of diligence required, for one of the exceptional features of this case is the baldness and plainness of the fraudulent alterations and the absence of any apparent effort on the part of the perpetrator of the frauds to conceal the evidence of them. It is obvious and conceded that if Barker had at any time looked over the returned checks the alterations to "or bearer" would have stared him in the face and disclosed the fraud at once. This he did not do himself, and the employee or officer to whom this duty was assigned was Churchman, the perpetrator of the fraud. There is, therefore, no question of fact involved. Any, even a cursory examination by an honest clerk would have resulted in the discovery of the plain alterations, and therefore the only question is whether the plaintiff is relieved from responsibility by the fact that the person charged by Barker, the treasurer, with the duty of making the examination was himself the forger, and, therefore, bound to conceal the alteration.

Upon this point we entirely agree with the following state-

ment of the rule and the reasons upon which it is based contained in *Critten vs. Chemical National Bank, supra:*—

"Of course, the knowledge of the forgeries that Davis pos-. sessed, from the fact that he himself was the forger, was in no respect to be attributed to the plaintiffs.  But we see no reason why they were not chargeable with such information as a comparison of the checks with the check book would have imparted to an innocent party previously unaware of  the forgeries.  The plaintiffs' position may be no worse because they intrusted the examination to Davis instead of to a third person; but they can be no better off on that account.  If they would have been chargeable with the negligence or failure of another clerk in the verification of the accounts, they must be equally so for the default of Davis, so far as the examination itself would have disclosed the facts."

It only remains to determine the one remaining question, which is also the first and most important one, but this can now be done in a very few words.

It is not for this Court to say in the pending cause whether the  evidence  bearing  upon the question of the negligence or want of due and reasonable care on the part of the bank in the payment of the altered checks was strong or weak when taken in connection with the evidence tending to show that the method in which the business of the plaintiff company was conducted was calculated to mislead the bank, was such as to constitute the proximate cause of the loss.  We are only called upon to say whether there was any legal evidence sufficient to be submitted to the jury for their consideration, and we are unhesitatingly of the opinion that the evidence should go to the jury under careful instruction from the Court.

It results, therefore, that the Court erred in the peremptory instruction to the jury to find for the defendant as a result of the evidence.

The  judgment is therefore reversed, and the case remanded to the Court below.