[S. F. No. 16867. In Bank. June 16, 1943.]

CARLO BASCH, Respondent, v. BANK OF AMERICA NATIONAL TRUST AND SAVINGS ASSOCIATION (a National Banking Association), Appellant.

318

Louis Ferrari, G. D. Schilling, James S. De Martini, D. Bianco and Hugh L. Preston for Appellant.

Belli & Leahy and Marshall E. Leahy for Respondent.

CURTIS, J.—For many years the plaintiff, Carlo Basch, owned and operated a retail drugstore—Basch's Pharmacy—in San Francisco, and since the establishment of such business he had maintained a commercial account in its name with the defendant bank at the main office at No. 1 Powell Street in said city. In May, 1938, he employed as a part-time bookkeeper one Herbert C. Lahr, who thereupon took charge of the office routine matters in connection with his employer's bank account and faithfully performed his work for the ensuing five months. About the first of November

of said year Lahr conceived the scheme of fraudulently diverting from this bank account sums of money for his own use, and between November 3, 1938, and September 9, 1939, he forged plaintiff's signature to a series of one hundred and twenty-seven checks payable to himself, all but four of which called for the payment of $37.50 each. These checks, cashed in various places by Lahr and in due course presented to the defendant's main office, were paid by the bank and, together with the genuine checks drawn during the same period, were charged to plaintiff's account. Plaintiff did not examine the bank's monthly statements or inspect the accompanying canceled checks as they were forwarded to him at regular intervals, but he delegated that duty to his bookkeeper Lahr. Consequently the forgeries were not discovered by plaintiff until the early part of September, 1939, after Lahr had absconded under circumstances which will be reviewed later. Prior thereto plaintiff had realized that his profits were decreasing, but inasmuch as no monthly profit and loss statements were made and a physical inventory was taken only once a year, he had simply assigned the decline to poor business. Immediately upon learning of the forgeries plaintiff notified the bank and demanded that it restore to him the total amount paid on the forged checks. After investigating the matter, the bank refused to make such reimbursement of plaintiff's account, and plaintiff thereupon commenced this action against the bank to recover such sum. The bank pleaded several special defenses, charging, in particular, negligence on the part of plaintiff (1) in failing to examine his monthly bank statements with the corresponding returned checks for the respective periods in question, thus permitting the continuance of the forgeries, which otherwise would have been detected; and (2) in entrusting the management of his banking affairs to Lahr without having made any inquiry at the time of the latter's employment as to his reputation for honesty and integrity. The cause was tried before a jury and a verdict was rendered against the bank for $4,740, the aggregate sum of the forgeries. From the judgment entered accordingly in favor of the plaintiff, the defendant bank prosecutes this appeal. Insufficiency of the evidence to support the verdict and error in the giving and refusal of certain instructions are urged as the grounds for reversal.

A preliminary statement of the general principles governing the question of liability as between a bank and its depositor when forged checks are involved will facilitate the discussion of the controversial points raised for consideration on this appeal.

It is settled law that a bank in receiving ordinary deposits becomes the debtor of the depositor, that its implied contract with him is to discharge this indebtedness by honoring such checks as he may draw upon it, and that in so doing it is charged with knowledge of its depositor's signature. (*Otis Elevator Co.* v. *First Nat. Bank,* 163 Cal. 31 [41 L.R.A.N.S. 529, 124 P. 704]; *National Dredging Co.* v. *President, etc. of Farmers' Bank,* 6 Penn. (Del.) 580 [69 A. 607, 16 L.R.A.N.S. 593, 130 Am.St.Rep. 158]; 4 Cal. Jur. 211, sec. 100; 9 C.J.S., Banks and Banking, p. 730, sec. 356a.) Consequently, a bank pays a forged check at its peril; and in such event, payment in legal contemplation will be considered to have been made from the bank's own funds so that it has no right to charge the depositor's account with the amount disbursed contrary to his genuine order, and it will be liable to him for so doing. Its responsibility in such case is, and should be, rigid. (*Glassell Dev. Co.* v. *Citizens' Nat. Bank,* 191 Cal. 375 [216 P. 1012, 28 A.L.R. 1427]; *Union Tool Co.* v. *Farmers etc. Nat. Bank,* 192 Cal. 40 [218 P. 424, 28 A.L.R. 1417]; *Frankini* v. *Bank of America,* 12 Cal.App.2d 298 [55 P.2d 232]; *Deer Island Fish & Oyster Co.* v. *First Nat. Bank,* 166 Miss. 162 [146 So. 116]; 4 Cal.Jur. 215, 216, secs. 103, 104; Michie on Banks and Banking, vol. 5, p. 498, sec. 274.) While no degree of care on the part of the bank will excuse it from liability, it may justify the payment of a forged check on principles of estoppel, or on the basis of negligent or misleading conduct of the depositor which directly or proximately caused the bank to pay. However, the bank must show due diligence before it can assert such defenses. (*Glassell Dev. Co.* v. *Citizens' Nat. Bank, supra; Union Tool Co.* v. *Farmers etc. Nat. Bank, supra; Sommer* v. *Bank of Italy,* 109 Cal.App. 370 [293 P. 98]; *Wussow* v. *Badger State Bank of Milwaukee,* 204 Wis. 467 [234 N.W. 720, 236 N.W. 687]; 9 C.J.S., Banks and Banking, pp. 730-732, sec. 356a.] Expository of the law in this regard is the

statement in *Glassell Dev. Co.* v. *Citizens' Nat. Bank,* 191 Cal. 375, 380 [216 P. 1012, 28 A.L.R. 1427] :

"The weight of authority, and perhaps of reason, supports the view that when a depositor's pass-book has been written up and returned to him with canceled checks which have been charged to his account, it is his duty to examine such checks within a reasonable time, and if they disclose forgeries or alterations to report them to the bank, failing in which he cannot, if his failure results in detriment to the bank, dispute the correctness of payments thereafter made by it on similar checks. (7 C.J. 687; *California Vegetable Union* v. *Crocker Nat. Bank,* 37 Cal.App. 743 [174 P. 920] ; *Morgan* v. *United States Mortgage & Trust Co.,* 208 N.Y. 218 [Ann. Cas. 1914D, 462, L.R.A. 1915D, 741, 101 N.E. 871].)

"This rule, however, assumes that the bank itself has not been guilty of negligence in making the payment, for when by the exercise of proper care it could have discovered the alteration or forgery, it must bear the loss notwithstanding that the depositor failed in his duty to examine the accounts. [Citing numerous authorities from other jurisdictions.]"

The import of the relationship between a bank and its depositor is authoritatively treated in 7 American Jurisprudence, page 371, section 516, as follows:

"A bank is under an obligation to its depositor to use care in scrutinizing checks paid in order to detect forgeries, and to render its accounts to prevent the perpetration of frauds upon its depositor. Therefore, if a bank, in the exercise of proper care, could have discovered the alteration or forgery of a customer's checks, it cannot throw the loss caused by paying them upon the depositor merely because he failed to examine his account. Or, stating the rule in terms of negligence, a bank which is guilty of negligence in failing to discover an alteration or forgery cannot avoid liability on the ground that the depositor was negligent in failing to examine his balanced passbook, statement of account, or returned checks. Consequently, in every case where suit is brought by a depositor to recover from a bank money deposited by him, which the bank has paid out otherwise than in conformity with his orders, and the bank sets up the defense that it is nevertheless entitled to charge the depositor with such payments because of conduct of the depositor subsequent to such payment, *the preliminary question to be*

*determined is whether the bank was or was not guilty of negligence in making the payments.* If it was negligent, if its officers are found to have failed to exercise due and reasonable care in detecting the forgery or fraud, then the subsequent negligence of the depositor, his failure to perform his duty in examining his passbook and vouchers with reasonable care and to report to the bank in a reasonable time any errors or mistakes, will constitute no defense.'' (Italics added.) ▇ The question of whether a bank was negligent in paying a forged or fraudulently altered check is generally one for the jury. (*Sommer* v. *Bank of Italy, supra; Frankini* v. *Bank of America, supra; National Dredging Co.* v. *President, etc., Farmers' Bank, supra; Leather Manufacturers' Bank* v. *Morgan,* 117 U.S. 96 [6 S.Ct. 657, 29 L.Ed. 811].)

▇ Measured in the light of the foregoing legal principles, the undisputed facts in this case establish beyond doubt that plaintiff was guilty of negligence not only in failing to exercise ordinary care and prudence in entrusting his employee Lahr with his banking affairs, but in disregarding the duty imposed upon him by law to examine and verify the bank's monthly statements and corresponding returned checks in relation to his own books of account. In this connection the record discloses the following points of consideration: Lahr, a stranger to plaintiff at the time he employed him in May, 1938, as a part-time bookkeeper at a salary of $25 per month, was so hired on the recommendation of plaintiff's nephew, for whom Lahr had been competently performing similar services for a short time. Plaintiff made no further inquiry of his new employee as to his antecedents or prior work. However, immediately following the discovery of the forgeries plaintiff learned that Lahr had a previous criminal record as a forger and embezzler; that he had served several jail sentences therefor, and that at the precise time plaintiff employed him he was posted in police headquarters as wanted by the State Division of Criminal Identification as a parole violator on a forgery conviction in El Dorado County, California. Moreover, upon slight investigation it was revealed that prior to his employment by plaintiff, Lahr had been discharged from other clerical positions in San

Francisco on grounds showing want of confidence in him. In fact, a few weeks after Lahr entered plaintiff's service, he cashed with plaintiff a fictitious check drawn on an out-of-state bank, and plaintiff compelled him to make it good; yet plaintiff continued to employ him in a responsible position.

Lahr's principal duties under the terms of his employment with plaintiff consisted in preparing bank checks against vouchers for plaintiff's signature, in keeping certain accounting records in connection with the banking transactions, in examining the monthly bank statements and accompanying canceled checks, and in reconciling such items with plaintiff's books of account. The checkbooks used, by plaintiff were of a uniform type—each page containing three checks attached to correspondingly numbered stubs and identifying, by appropriate printing in the lower right-hand corner above the line for plaintiff's signature, the chargeable account as "Basch's Pharmacy." One of the accounting records plaintiff required Lahr to keep was a "combination cash journal and bank account." Each page thereof was divided into columns; and in one of the double columns labeled "Bank" Lahr was supposed to enter the dates, and amounts of the bank deposits, and the dates, amounts and numbers of the checks drawn against the deposits; and to enter the total amounts of the deposits and withdrawals at the bottom of the respective columns.

Being thus entrusted by plaintiff with the office management of the pharmacy's banking affairs, Lahr was in a position to pursue his criminal enterprise in the following manner: He would detach from the checkbook a complete sheet of blank checks and destroy the stubs; he would then place a piece of carbon paper and a canceled check bearing plaintiff's genuine signature over a blank check and trace the true signature with a hard lead pencil; then he would remove the blank check and trace thereon with pen and ink the thin carbon impression of plaintiff's signature, and afterwards erase the carbon stains from the spurious checks and any pencil marks appearing on the canceled check employed in the tracing operation. Thereupon Lahr filled in the face of the check, making it payable to himself. He made no entry of the forged checks in the "combination cash journal and bank account." During the period of the forgeries, Lahr,

upon receipt of the respective envelopes. containing the bank's monthly statements and the corresponding canceled checks, would immediately withdraw therefrom all the forged checks, some of which he destroyed. Then after reconciling the genuine checks with the stubs and entries in plaintiff's "combination cash journal and bank account," wherein he had itemized only the genuine checks, Lahr would falsify the totals at the bottom of the accounting book column and in the checkbook to coincide with the balance shown on the pertinent bank statement, return the genuine checks to the appropriate envelope, and mark it "O.K."

Lahr's forgeries were finally discovered by plaintiff in this way: In September, 1939, Lahr gave to an airline company in payment of his fare to Los Angeles one of the forged checks for $37.50, which he stated to be his salary remittance. After the plane had left the airfield, a representative of the company telephoned to Basch's Pharmacy to verify the authenticity of the check, and was informed by plaintiff that the check was a forgery and would not be honored. Upon the arrival of the plane in Los Angeles Lahr, when told that he had passed a bad check in the airline's San Francisco office, made good the amount to the company, and he was permitted to depart. Immediately upon receiving the telephone message from the airline company plaintiff, with the assistance of the police and an accountant, investigated his bank statements, canceled checks and books of account, and such examination at once disclosed the prior forgeries. In the meantime plaintiff notified the bank of these defalcations. Lahr was subsequently apprehended, convicted of the forgery here involved, and sentenced to imprisonment in the penitentiary. He gave his testimony at the present trial by way of deposition.

Lahr negotiated a total of one hundred and twenty-seven forged checks over a period of ten months. In November, 1938, the first month of his fraudulent undertaking, he cashed four of the spurious checks; the first for $40.00, the second for $35.00, the third for $37.50, and the fourth for $27.50. He then devised the scheme of drawing each check for a uniform amount—$37.50—so that the series would appear to be salary payments, and his only variance from this plan occurred in January, 1939, in the case of a check for $25.00. Accordingly, for this fixed amount he cashed four checks in December, 1938, five in January, 1939, nine in February, ten

in March, eight in April, fifteen in May, eighteen in June, twenty-two in July, twenty-three in August, and eight in September. The forged checks were listed on the bank's respective monthly statements sent to plaintiff and were included in the corresponding envelopes of canceled checks returned to him with these periodical itemizations. At the bottom of each statement was printed the following language: "Please examine this statement at once. If no error is reported in ten days the account will be considered correct. All items are credited subject to final payment." But, as previously mentioned, plaintiff did not examine or verify any of the bank's monthly statements or canceled checks, nor did he undertake to reconcile the same with his books of account or the check stubs. He left these matters of bookkeeping reconcilement entirely to Lahr. Not even in May, 1939, when required to cover with a sizable deposit an overdraft standing against his account—the first time such charge had been made against plaintiff during the many years he had been a depositor with the defendant bank—did plaintiff undertake to investigate his banking records, but he accepted without question Lahr's explanation that the latter's bookkeeping mistake in combination with the payment of several large bills a few days previously had caused the unexpected deficiency in the account.

While the undisputed testimony of plaintiff that the above-quoted ten-day time limitation—a reiteration of a provision appearing on the authorization card for the mailing of statements as it was signed by plaintiff on the occasion of opening his bank account—was never called to his attention nor noticed by him prior to the discovery of the forgeries precludes giving to such provision the dignity and effect of a contract, either to constitute the statements accounts stated or to relieve the bank from its liability for the payment of forged checks (*Los Angeles Inv. Co.* v. *Home Savings Bank,* 180 Cal. 601 [182 P. 293, 5 A.L.R. 1193]; *Frankini* v. *Bank of America,* 31 Cal.App.2d 666 [88 P.2d 790]; *Wussow* v. *Badger State Bank of Milwaukee,* 204 Wis. 467 [234 N.W. 720, 236 N.W. 687]), plaintiff nevertheless as a depositor had a legal duty, according to the authorities cited in the forepart of this opinion, to examine *within a reasonable time* the documentary evidence forwarded to him by the bank as indicative of the status of his account and to report without delay any discrepancies revealed upon comparison with his own records.

Obviously, if plaintiff had performed that duty of verification in regard to the conduct of his banking business, he would have easily detected the forgeries, and the exposure of the first or any of the succeeding ones would have avoided a repetition. As a matter of fact, when the suspicions of plaintiff were aroused and the ensuing investigation undertaken, the discrepancies were discovered in a few minutes. On this subject the court in the case of *California Vegetable Union* v. *Crocker Nat. Bank,* 37 Cal.App. 743 [174 P. 920], after stating that the numerous authorities recognizing the duty of a depositor to examine his balanced bankbook apply with equal force to the analogous modern situation where statements are periodically furnished by a bank to its depositors on balancing their accounts and returning the canceled checks to them, pertinently added the following observation at page 751 of the opinion: "If depositors may regularly at frequent intervals receive their vouchers and be notified, as was the [depositor] here, of reduced balances of their accounts in banks consequent upon the unfaithfulness of trusted employees during a period of nearly a year, and by neglecting to exercise reasonable supervision over their own business fail to discover fraud which has been perpetrated upon them and the bank, and may thus leave the bank in ignorance of the frauds thus committed, and charge the bank with the losses thus occasioned, then banks and their paying tellers face hard conditions indeed. We do not feel justified in establishing any such rule in this state."

Nor does the fact that plaintiff delegated the duty thus imposed upon him by law to a faithless employee serve as a legal excuse for not discharging this duty himself. According to the generally adopted rule, when the agent to whom the duty of examination is intrusted is a dishonest employee who by forgery has obtained funds of his employer from the bank, and whose consequent adverse interest causes him to conceal from his employer the circumstances which would naturally have been disclosed in the course of a proper verification, the employer, though not imputed with knowledge of the fraud of his faithless agent, is, as principal, chargeable with such information as an honest employee, unaware of the wrongdoing, would have acquired from the examination of the canceled checks and bank statements. (9 C.J.S., Banks and Banking, p. 745, sec. 356d (2) ; *Dana* v. *National Bank of Republic,* 132 Mass. 156; *First Nat. Bank*

v. *Allen,* 100 Ala. 476 [14 So. 335, 27 L.R.A. 426, 46 Am.St. Rep. 80]; *Critten* v. *Chemical National Bank,* 171 N.Y. 219 [63 N.E. 969, 57 L.R.A. 529]; *National Dredging Co.* v. *President, etc. Farmers' Bank,* 6 Penn. (Del.) 580 [69 A. 607, 16 L.R.A.N.S. 593, 130 Am.St.Rep. 158]; *Deer Island Fish & Oyster Co.* v. *First. Nat. Bank,* 166 Miss. 162 [146 So. 116]; *Leather Manufacturers' Bank* v. *Morgan,* 117 U.S. 96 [6 S.Ct. 657, 29 L.Ed. 811]; see also annotation: 15 A.L.R. 162; 67 A.L.R. 1124; 103 A.L.R. 1148.) Consistent with the settled principles upon which the relation of bank and depositor is founded, this rule reasonably imposes upon the depositor the further duty of properly supervising the conduct of his trusted employee, for "aside from its own diligence, a bank's only protection against forgeries by a confidential agent to whom settlement of the bank account has been delegated is verification of statements by the depositor himself, who in such case is clearly responsible for the acts and omissions of his agent in the course of duties with which he had entrusted him. *Myers* v. *S.W. National Bank,* 193 Pa. 1 [44 A. 280, 74 Am.St.Rep. 672]. In such instances the cases hold that knowledge of a dishonest agent of fraudulent entries and incorrect balance is equally the knowledge of his principal, with the qualification, however, that the principal is chargeable, not with the knowledge of wrongdoing the agent possessed from the fact that he himself was dishonest, but with knowledge of such facts as an honest agent, unaware of the wrongdoing, would acquire when examining the statements within the scope of his employment. The dishonesty of the agent does not change his relationship to his principal, and accordingly does not change the rule charging his principal with knowledge of such facts. (Citing authorities.)" (*First National Bank* v. *Farrell,* 272 F. 371, 376 [16 A.L.R. 651].) Thus, in the absence of such reasonable supervision, the mere designation of an agent to discharge a duty resting primarily upon the principal—the depositor—cannot be deemed the equivalent of performance by the latter. (*Leather Manufacturers' Bank* v. *Morgan, supra;* Michie on Banks and Banking, vol. 5, p. 554, sec. 285.)

In connection with the consideration of the duty plaintiff owed the bank by way of examination of his canceled checks and monthly statements, his failure to heed the import of the singular notice of overdraft in his account in May, 1939, as above-mentioned, merits some passing com-

ment. A depositor may not sit idly by after knowledge has come to him that his funds seem to be disappearing or that there may be a leak in his business, and refrain from taking the steps that a careful and prudent business man would take in such situation, and which, if taken, would result in stopping the issuance of the forged checks. The failure to take such steps would support a charge of negligence against the depositor. (*Detroit Piston Ring Co.* v. *Wayne County & Home Savings Bank*, 252 Mich. 163 [233 N.W. 185, 75 A.L.R. 1273].) The isolated occurrence of this overdraft in the many years of plaintiff's maintenance of his account with the defendant bank was a fact of impressionable force and should have apprised him that something was amiss with the management of his banking affairs. Instead of making some personal examination of his pertinent records, a course of action which the dictates of ordinary prudence ought to have suggested as a proper precautionary measure incident to covering the amount of the overdraft charged against his account, plaintiff contented himself with a superficial inquiry of Lahr, the bookkeeper whom he mistakenly trusted, and made no challenge of that employee's easily discreditable explanation that the default was attributable in part to a bookkeeping error and in part to large withdrawals to meet unusual business expenses a few days prior to receipt of the bank's notice of the deficiency. ■ However, these circumstances of plaintiff's remissness furnish no ground for holding that he, by depositing a sum sufficient to cover the overdraft, either adopted the forged checks as genuine and ratified the payment or estopped himself from asserting the forgeries. It would strain the doctrine of ratification to hold that a person had ratified or adopted as his own the unauthorized act of another, of which he had no information, or which was promptly repudiated as soon as brought to his knowledge. (*First National Bank* v. *Allen*, 100 Ala. 476 [14 So. 335, 46 Am.St.Rep. 80, 27 L.R.A. 426]; *Critten* v. *Chemical National Bank*, 171 N.Y. 219 [63 N.E. 969, 57 L.R.A. 529].) No more in this than in any other instance of failure to exercise reasonable supervision over his banking affairs is plaintiff to be imputed with knowledge of his dishonest agent's fraud or his recovery precluded on the basis of ratification of his faithless employee's wrongdoing. All such situations simply involve considerations of lack of due diligence on the part of the depositor and require the application of like legal prin-

ciples in the measure of the effect of *his negligence* with reference to the bank's payment of the forged checks.

Under the authorities above cited, as well as others, the remiss conduct of the depositor in such cases as this is available as a defense to the bank *only* where it appears that the bank itself is free from negligence in the first instance in the payment of the forged checks. If in the exercise of due care the bank would have detected the forgeries without the aid of the depositor, the bank cannot then escape its contractual liability merely because the depositor was also at fault. In such circumstances the bank does not pay because previous forgeries were not reported to it, but it pays because on its own negligent inspection it supposed the checks were genuine. Moreover, in line with the rigor of the rule that a bank pays out the money of its depositors on forged instruments at its peril, it was held in *Sommer* v. *Bank of Italy,* 109 Cal.App. 370, 376 [293 P. 98], that a bank seeking to escape liability for cashing unauthorized checks drawn against its depositor's account has the burden of proving as a preliminary point its own freedom from negligence in the matter.

It is plaintiff's contention that the record establishes that the bank was negligent in the following respects: (1) that its "system was wrong" in that it gave no instructions to its employees "relative to detecting forgeries, or in handwriting"; (2) that it assigned duties to employees who were not competent to "discharge the system set up" by the bank; and (3) that the employees were negligent in the performance of their duties. There is no merit to plaintiff's first two charges. Without detailing the evidence bearing on these initial points, it will suffice to state that the undisputed testimony of qualified witnesses on the subject shows that the bank's system of examining checks for irregularities and training its employees to that end is essentially the same as that followed in all San Francisco banks, and is regarded as the accepted modern practice. However, as to the third proposition here advanced by plaintiff, there is substantial evidence indicating that by the exercise of proper care and skill the bank's employees could and should have discovered some of the forgeries. In this connection the record shows that eighty-three of the series of forged checks were produced by plaintiff at the trial and were received in evidence; that some twenty of those so produced were shown to the teller who had been

in charge of the division handling plaintiff's banking account during the period of the forgeries, and some three or four years prior thereto; that after inspecting these twenty checks, he admitted that several of them bore evidence of forgery and should not have been passed. Three of those so specified by him were of the group of four forged and cashed during the first month of Lahr's criminal undertaking—November, 1938—and two of them he himself had previously honored as genuine. Furthermore, three or four of the others which he said showed evidence of irregularities and palpable line tremor in the signature were originally passed by him. It is true that certain other witnesses gave testimony to the effect that they would have passed these same checks, but on appeal such conflicts in the record must be resolved against the appellant. The evidence also discloses that it was the standard practice of the bank that tellers should not honor checks which were postdated or without date, or which showed trace of erasures; that all such checks were to be referred to an officer of the bank for verification and disposition; that despite these established rules of procedure, of the forged checks on exhibit at the trial as passed by tellers handling plaintiff's bank account, one was postdated, another was undated, and many of them showed erasure marks. It further appears that as to a large group of the forged checks in evidence, certain witnesses called by the bank testified that the signatures attached thereto were ''excellent facsimiles'' of the genuine signature. However, in the final analysis the quality of the forgeries was a question of fact peculiarly appropriate for the jury to determine from these several opposing considerations, and apparently it was convinced that the bank's employees were negligent in passing the forged instruments.

Nor can it be said under this state of the record that the unavailability of forty-four of the forged checks for production at the trial precluded a finding by the jury that the bank was responsible to plaintiff for their payment. It appears from the evidence that the missing group consisted of all the forged checks cashed during the months of December, 1938, and January, February, March and May, 1939; that Lahr, when confronted with plaintiff's banking records, was able to identify beyond dispute these items as to time of execution and amount (each for $37.50 except one in January for $25.00, or a total of $1,637.50); that all of these missing checks had been theretofore delivered to plaintiff by the bank

with his respective monthly statements and had been subsequently destroyed by Lahr as part of his scheme of concealing his wrongdoing from plaintiff. The fact that Lahr employed the precise same *modus operandi* with respect to all of the forgeries—that is, he traced plaintiff's genuine signature from a legitimate check onto the forged one under the conditions heretofore outlined—gives rise to a reasonable inference that the checks destroyed were substantially similar in appearance to the eighty-three introduced as exhibits in the course of the trial. Moreover, as previously noted, the four checks forged in the first month were in evidence and the bank's teller particularly concerned with plaintiff's account conceded that three of them were obvious forgeries and should not have been passed. Had these been exposed by the bank, the subsequent forgeries would not have occurred. (*Critten* v. *Chemical National Bank,* 171 N.Y. 219 [63 N.E. [969], 973, 57 L.R.A. 529].) In addition, all of the checks were made to the order of the same payee, and all but four of the one hundred and twenty-seven were for the same amount— $37.50—a suspicious circumstance that should have put the bank on notice. (*Frankini* v. *Bank of America,* 12 Cal.App. 2d 298 [55 P.2d 232].) These several observations relating to the bank's uniform treatment of the entire series of forged checks and its employees' failure to exercise reasonable diligence in the handling of plaintiff's banking account over the ten-month period here involved constitute ample support for the jury's implied finding that the bank was as negligent in cashing the missing checks as it was in cashing the ones in evidence—that the same considerations governed in measuring the liability for the total resulting loss.

In such situation there is no basis for invocation of the doctrine of equitable estoppel in bar of plaintiff's claim for the amount represented by the missing checks. The bank argues that the unavailability of these forged instruments at the trial, because of their previous destruction by Lahr, placed it at a disadvantage on the issue of the quality of such forgeries, and that as the absence of such evidentiary matter was attributable to plaintiff's own negligence in connection with his failure to exercise reasonable supervision over his banking affairs, he cannot recover the amount of such unauthorized payments from his bank account. But the depositor's negligence *subsequent* to the commission of the forgeries—remiss conduct predicate of the defense of estoppel— like his *prior* carelessness in hiring a dishonest employee—is

available to relieve a bank from its absolute liability on forged instruments *only* in the event it has itself been free from negligence. (*Union Tool Co.* v. *Farmers etc. Nat. Bank,* 192 Cal. 40 [218 P. 424, 28 A.L.R. 1417].) The general proposition distinguishing the present situation from the ordinary negligence case is aptly stated in *Sommer* v. *Bank of Italy,* 109 Cal.App. 370, 376 [293 P. 98], as follows: "When the depositor makes out a *prima facie* case by showing that the bank has made payment from his account on forged checks and has refused upon demand to pay the sum represented by the forged checks, the burden is not upon the depositor to show that the bank was negligent in cashing the checks and that he was free from negligence. The burden is then upon the bank to show by way of defense that the depositor was negligent and that the bank was free from negligence." Nor, in line with the principle of this strict rule of liability, is it unreasonable to require of the bank the establishment of its own freedom from negligence as a prerequisite condition to asserting an estoppel by conduct in defeat of the depositor's claim. As was said in this regard in *Wussow* v. *Badger State Bank of Milwaukee,* 204 Wis. 467, 474 [234 N.W. 720, 236 N.W. 687] : "The right to assert an estoppel in equity does not arise unless the one asserting it has acted with due diligence. Due diligence being necessary to enable one to assert an estoppel, the bank must show due diligence before it can assert the negligence of the depositor. The whole doctrine of estoppel is a creation of equity and is governed by equitable principles. 2 Pomeroy, Eq. Jur. (4th Ed.) sec. 813." To like effect, see *Coleman Drilling Co.* v. *First Nat. Bank* (Tex.Civ.App.), 252 S.W. 215, and *Graham* v. *Southington Bank & Trust Co.,* 99 Conn. 494 [121 A. 812]. The basic principle of application of this fundamental rule in the law of estoppel would not fluctuate in pertinency according to the nature of the subsequent negligence chargeable against the depositor, but it would be equally operative whether his objectionable conduct following his dishonest employee's commission of the forgeries concerned the failure to examine the monthly bank statements or the loss of the checks on which recovery is sought.

The import of the various factors bearing upon the negligence of the respective parties to this action was for the jury to determine (*Frankini* v. *Bank of America,* 12 Cal.App.2d 298 [55 P.2d 232]; *National Dredging Co.*

v. *President, etc. Farmers' Bank*, 6 Penn. (Del.) 580 [69 A. 607, 16 L.R.A.N.S. 593, 130 Am.St.Rep. 158]; *Deer Island Fish & Oyster Co.* v. *First Nat. Bank*, 166 Miss. 162 [146 So. 116]; *Leather Manufacturers' Bank* v. *Morgan*, 117 U.S. 96 [6 S.Ct. 657, 29 L.Ed. 811]), and the rule that the defense of estoppel is not available to the bank in the face of its own negligence must prevail in this case in view of the implied finding of the jury that the bank's failure to exercise due care to discover the forgeries before cashing the forty-four missing· checks was the proximate cause of that resulting loss. The unavailability of this group of checks did not change the burden of proof placed upon the bank in order to escape liability for such unauthorized payments, and the jury's conclusion as to the question of its negligence in this regard, based upon reasonable inferences from the evidence as above detailed, is binding on this appeal. (*Sommer* v. *Bank of Italy, supra; Frankini* v. *Bank of America, supra.*) Moreover, in other jurisdictions in cases wherein the failure to produce the checks at the trial, because of their previous destruction by the forger, presented the question of the effect of their negligent loss upon the depositor's right to recover thereon, judgment in favor of the depositor for the full amount of the forgeries has been sustained in view of the jury's finding on competent evidence that the bank was negligent in the first instance in passing the forged instruments. (*First Nat. Bank of Weslaco* v. *Patty* (Tex.Civ.App.), 62 S.W.2d 629; *New York Produce Exchange Bank* v. *Houston* (C.C.A.), 169 F. 785 [95 C.C.A. 251].)

■ Passing to a consideration of the matter of the instructions, there is nothing in the points advanced by the bank which calls for a reversal of the judgment. The first objection is directed against the latter portion of an instruction wherein the jury was charged that if it found that the bank was negligent in failing to detect the forgeries committed in November, 1938, then the bank would be responsible for all loss to the plaintiff proximately caused by that negligence, and that it "may consider under such a finding of negligence" the question of whether "that negligence was the proximate cause of the forger being enabled to continue his wrongdoing on any or all future checks and as well in determining whether or not the bank was negligent in the examination and payment of subsequent forged checks received . . . and charged to plaintiff's account." The term "proximate cause" was fully

and correctly defined in the next instruction given to the jury. The bank argues that even though it was negligent in the payment of the forged checks during this first month, such circumstance in no event could be legally considered the proximate cause of the forger's continuance of his wrongdoing; and further, that the instruction was misleading in that it erroneously assumed that evidence was introduced showing that the forger predicated the pursuit of his fraudulent scheme upon his initial success in passing the forged instruments. However, an examination of the entire instruction reveals that it does not embody such assumption. It states merely that if the jury should find as a fact that the bank was negligent in cashing the November checks, the jury "may consider" such fact in determining whether it was the proximate cause of the forger continuing in his wrongdoing. Moreover, a complete answer to the bank's position relative to the effect of evidence of its negligence for the first month's unauthorized payments is furnished by one of the authorities cited and emphasized by the bank on another point, the well-considered case of *Critten* v. *Chemical National Bank*, 171 N.Y. 219 [63 N.E. 969, 57 L.R.A. 529], wherein the New York Court of Appeals stated in substance that it might well be found that had the bank not been negligent in failing to detect the first forgeries, the forger would not have been able to have continued with the subsequent series until the time of his arrest. Likewise pertinent is the analysis in *Deer Island Fish & Oyster Co.* v. *First Nat. Bank*, 166 Miss. 162 [146 So. 116], as to the possible consequence of the bank's original negligence in relation to the forger's continuance of his wrongdoing. Nor on this basis is there merit to the bank's final objection to this same instruction—that it erroneously failed to give recognition to the legal effect of the plaintiff's imputed knowledge as to the existence of the forgeries. This subject not only was properly treated in connection with this particular charge referable to the determinative correlation of duties of the respective parties, but also in several of the instructions which the trial court gave at the instance of the bank this matter was amply and carefully covered.

The second instruction here under attack directed the jury that if it "should find from the evidence . . . that the . . . bank was negligent in failing to detect the forgery of Basch's checks, then the subsequent negligence of Basch, if any, or any failure to perform his duty to the bank in ex-

amining his monthly statements and cancelled checks with reasonable care . . . or any failure to report to the bank within a reasonable . . . time any errors . . . in his account will constitute no defense to the Bank." This charge, predicated upon the bank's obligation to establish its own freedom from negligence as a condition precedent to its exemption from liability, is in strict accord with the rules of law hereinabove discussed as applicable in the disposition of this case, and the bank's objection thereto is therefore untenable. As was said in *Deer Island Fish & Oyster Co.* v. *First Nat. Bank,* 166 Miss. 162, 178 [146 So. 116] : "It has been thought that a bank engaging in the business of depositing and paying out money on checks and other exchange is equipped to discover forgeries and to safely preserve its depositors' money. The bank holds out to the public that its officers and agents are skilled in all matters connected with, and relating to, its ability to detect and prevent forgery."

The court's refusal to give certain proposed instructions of the bank as quoted in its opening brief was required under the established authorities. The first of these contained the following erroneous statement of law with regard to the forgeries committed in the first month, November, 1938 : "In determining whether or not the bank failed to exercise ordinary care and prudence in the payment of the forgeries in this case, you are instructed not to take into consideration the forged checks charged to the statement of account delivered to plaintiff by defendant on or about December 1, 1938." The other two of these rejected instructions misstate the applicable doctrine of negligence in such a situation as is here involved, for in connection with the respective references to the plaintiff's duty to examine his monthly bank statements and canceled checks, each instruction erroneously neglects to make proper allowance for the jury's consideration of evidence relating to the bank's liability in conformity with the legal proviso that in order to invoke the defense of the depositor's negligence—whether prior or subsequent to the dishonest employee's commission of the forgeries—the bank must show that it was free from negligence.

From the foregoing consideration of the points presented for review on this appeal, it is clear that the record presents no ground of reversible error, and the judgment is therefore affirmed.

Gibson, C. J., Shenk, J., Carter, J., and Traynor, J., concurred.

SCHAUER, J.—I concur in the judgment on the ground that the defendant bank failed to establish its own freedom from negligence in any of the instances in which it honored forged checks against plaintiff's account and, hence, that negligence of the plaintiff is immaterial. Regardless of all other discussion, that one proposition is determinative of this appeal. (See *Sommer* v. *Bank of Italy* (1930), 109 Cal.App. 370, 376 [293 P. 98]; *Union Tool Co.* v. *Farmers etc. Nat. Bk.* (1923), 192 Cal. 40, 47-48 [218 P. 424, 28 A.L.R. 1417]; *Glassell Dev. Co.* v. *Citizens' Nat. Bk.* (1923), 191 Cal. 375, 380 [216 P. 1012, 28 A.L.R. 1427].)

Edmonds, J., concurred.

Appellant's petition for a rehearing was denied July 15, 1943. Schauer, J., voted for a rehearing.