184 Cal.App.4th 1333 (2010)
109 Cal.Rptr.3d 806
CHINO COMMERCIAL BANK, N.A., Plaintiff and Respondent,
v.
BRIAN D. PETERS, Defendant and Appellant.
No. E049170.
Court of Appeals of California, Fourth District, Division Two.
May 25, 2010.
*1334 Hanke & Williams and Rick D. Williams for Defendant and Appellant.
Perez & Hawes and Eric Everett Hawes for Plaintiff and Respondent.

*1335 OPINION
RICHLI, J.
Appellant Brian D. Peters is the victim of a Nigerian-style e-mail scam. He agreed that his corporation would receive money supposedly owed to a gentleman in Malaysia and would then pay that money out as the gentleman directed in exchange for a 15 percent fee. His corporation received checks totaling $808,988.90 and deposited them in an account with respondent Chino Commercial Bank, N.A. (the Bank). It then had the Bank pay out $468,000. Thereafter, all of the checks that had been deposited bounced.
The Bank filed this action to recover the resulting overdraft. It promptly obtained a right to attach order against Peters. Peters appeals from the right to attach order. He argues that the Bank had the burden of proving that it did not act negligently and that it failed to carry this burden.
(1) We will hold that, under the California Uniform Commercial Code, Peters had the burden of proving that the Bank did act negligently, and he failed to do so. Hence, we will affirm.

I

FACTUAL BACKGROUND
Faux Themes Inc. (Faux or the corporation) is a corporation in the construction business. In March 2008, it opened a checking account with the Bank. Both Peters and Marilyn Charlnoes were authorized signers on the account. Peters was the president of the corporation; Charlnoes was the treasurer of the corporation.
The written account agreement defined "you" and "your" as "the account holder(s) and anyone else with the authority to deposit, withdraw, or exercise control over the funds in the account." It then provided: "Each of you also agrees to be jointly and severally (individually) liable for any account shortage resulting from charges or overdrafts . . . ."
Until April 2009, the average monthly balance in the account ranged from $3,000 to $5,000; the deposits in any one month never exceeded about $10,000.
In March 2009, Peters received an e-mail supposedly from Husaine Norman, a citizen of Malaysia. Norman said that certain third parties in the United States and Canada owed him money; however, they were insisting that "they can not transfer the funds to any bank account outside America continent due to their new company policy." He asked Peters to "assist me in *1336 receiving the funds and forward to me." He offered to pay Peters 12 percent of the money. Peters agreed (apparently after negotiating an increase of his fee to 15 percent).
On April 30, 2009, Faux received a check for $178,000; Peters had Charlnoes deposit it. On May 8, 2009, the Bank confirmed that the check had cleared. Charlnoes then had the Bank wire $80,000 to a bank in Hong Kong.
Also on May 8, 2009, Faux received a second check, for $373,988.90; Peters had Charlnoes deposit it.
On May 12, 2009, Charlnoes had the Bank wire another $71,000 to the same bank in Hong Kong.
On May 15, 2009, the Bank confirmed that the second check had cleared, and Charlnoes had the Bank wire $317,000 to a bank in China. On May 21, 2009, Faux received a third check, for $257,000; Peters had Charlnoes deposit it.
On May 22, 2009, the Bank was notified that the first check had been altered, so as to change the name of the payee to Faux. On May 28, 2009, the Bank was notified that the second and third checks had been similarly altered. Because all three checks were dishonored, the account was overdrawn in the total amount of $458,782.60.
Dann H. Bowman, the president of the Bank, met with Peters. Peters brought along all of his e-mail correspondence with Norman. Bowman told Peters that he "had been caught up in a check cashing scam." At one point, Peters remarked that his arrangement with Norman "seemed pretty fishy to me . . . but, times being what they are, I decided to take the chance." Peters testified, however, that he "did not knowingly participate in the scam . . . ." Indeed, he noted, he was a victim of the scam.
When the Bank got back the original checks, it examined them and found that they had been altered "with an acid that was originally used by architects to remove ink from blueprints . . . ." They had no "facial irregularities" "[n]o discolorations, smudges, misalignments or disturbances of the backgrounds or watermarks . . . ." The alterations were "in fonts and type sizes that were consistent [with] the other printing on the [c]hecks." In accepting the checks for deposit, the Bank had acted in conformity with its own procedures, which were "consistent with industry procedures nationally . . . ."

*1337 II

PROCEDURAL BACKGROUND
The Bank filed this action against defendants Faux, Peters, and Charlnoes, asserting causes of action for breach of contract and fraud. It then filed an application for a right to attach order, seeking to attach property of Peters and Charlnoes.
At the hearing on the application, the trial court noted that "[t]he recommendation from Research was to deny the [order] because of the allegations that Chino Commercial Bank was negligent . . . ." Nevertheless, it granted the right to attach order as to property of Peters (although it denied it as to property of Charlnoes).
The trial court essentially reasoned that Peters had the burden of proving that the Bank had been negligent, particularly as he had been negligent himself. It was concerned that Peters, despite being culpably negligent, "then looks to the Bank and says, `You should have prevented me from doing that.'"
It concluded that the Bank had "met [its] burden . . . to . . . show that Mr. Peters was intricately involved in this." Peters, on the other hand, had not introduced sufficient evidence that the Bank was negligent: "Unless I have some better evidence [than] you saying, `Well, they're negligent, too'that doesn't prove anything."

III

THE TRIAL COURT PROPERLY FOUND THAT THE BANK HAD DEMONSTRATED THE PROBABLE VALIDITY OF ITS CLAIM
(2) To grant the right to attach order, the trial court had to find that the Bank had established the "probable validity" of its claim. (Code Civ. Proc., § 484.090, subd. (a)(2).) "A claim has `probable validity' where it is more likely than not that the plaintiff will obtain a judgment against the defendant on that claim." (Code Civ. Proc., § 481.190.)
Peters is essentially challenging the trial court's implied finding of probable validity. To the extent that this presents a question of fact, we apply the deferential substantial evidence standard of review. (Crocker National Bank v. City and County of San Francisco (1989) 49 Cal.3d 881, 888 [264 Cal.Rptr. 139, 782 P.2d 278].) "If the trial court resolved disputed factual issues, the *1338 reviewing court should not substitute its judgment for the trial court's express or implied findings supported by substantial evidence. [Citations.]" (People ex rel. Dept. of Corporations v. SpeeDee Oil Change Systems, Inc. (1999) 20 Cal.4th 1135, 1143 [86 Cal.Rptr.2d 816, 980 P.2d 371].) "`[W]e must consider the evidence in the light most favorable to the prevailing party, giving such party the benefit of every reasonable inference, and resolving all conflicts in support of the judgment. [Citation.]' [Citation.]" (Gooch v. Hendrix (1993) 5 Cal.4th 266, 279 [19 Cal.Rptr.2d 712, 851 P.2d 1321].) To the extent, however, that the trial court's finding presents a question of law, we review it independently. (Crocker National Bank, at p. 888.)
Surprisingly, Petersand even more surprisingly, the Bankboth misidentify the applicable law. They cite and discuss Pac. Coast Cheese, Inc. v. Sec.-First Nat. Bk. (1955) 45 Cal.2d 75 [286 P.2d 353], Basch v. Bank of America (1943) 22 Cal.2d 316 [139 P.2d 1], and Glassell Dev. Co. v. Citizens' Nat. Bk. (1923) 191 Cal. 375, [216 P. 1012] as if these were the leading authorities; the Bank merely argues that they are distinguishable. These cases, however, have all been superseded by California's adoption of the Uniform Commercial Code, effective on January 1, 1965. (Stats. 1963, ch. 819, p. 1849.)
The crucial provision here is California Uniform Commercial Code section 3406 (section 3406), which states:
"(a) A person whose failure to exercise ordinary care contributes to an alteration of an instrument or to the making of a forged signature on an instrument is precluded from asserting the alteration or the forgery against a person who, in good faith, pays the instrument or takes it for value or for collection.
"(b) Under subdivision (a), if the person asserting the preclusion fails to exercise ordinary care in paying or taking the instrument and that failure contributes to loss, the loss is allocated between the person precluded and the person asserting the preclusion according to the extent to which the failure of each to exercise ordinary care contributed to the loss.
"(c) Under subdivision (a), the burden of proving failure to exercise ordinary care is on the person asserting the preclusion. Under subdivision (b), the burden of proving failure to exercise ordinary care is on the person precluded."[1]
*1339 (3) It is undisputed that the Bank is "a person who, in good faith, pa[id] the instrument or t[ook] it for value or for collection." (§ 3406, subd. (a).) "Good faith" simply means that the Bank acted honestly and in accordance with "reasonable commercial standards of fair dealing." (Cal. U. Com. Code, § 1201, subd. (b)(20).) Under an earlier version of the Uniform Commercial Code, which used a different definition of "good faith," negligence could be considered in determining good faith. (Hollywood Nat. Bank v. International Business Machines Corp. (1974) 38 Cal.App.3d 607, 613 [113 Cal.Rptr. 494].) Under the current version, however, negligence does not defeat good faith. (2 White & Summers, Uniform Commercial Code (5th ed. 2008) § 19-3(c), pp. 285-286.) Indeed, this follows from the structure of section 3406 itself; it contemplates that a person may have acted in good faith under subdivision (a), yet have failed to exercise ordinary care under subdivision (b).
Accordingly, if Peters's failure to exercise ordinary care contributed to the alteration of the instrument, he is at least partially precluded from asserting the alteration as a defense against the Bank. The trial court found that Peters failed to exercise ordinary care. There is ample evidence to support this conclusion, and Peters does not challenge it; quite the contrary, he concedes that he "was, shall we say, less than smart in moving forward on the transaction . . . ."
(4) Under section 3406, subdivision (b), however, if the Bank failed to exercise ordinary care, and if that failure contributed to the loss, the loss must be allocated between the Bank and Peters. Significantly, even if the Bank was negligent, it is not wholly precluded from recovering against Peters. Its recovery is merely reduced, in accordance with principles of comparative negligence. (2 White & Summers, Uniform Commercial Code, supra, § 19-3(d), pp. 286-288.) Moreover, under section 3406, subdivision (c), it was Peters who had the burden of proving that the Bank failed to exercise ordinary care. (See Bank of Tex. v. VR Elec., Inc. (Tex.Ct.App. 2008) 276 S.W.3d 671, 680-681.)
The Bank argues that the legal principles that would apply to a negligence action by a depositor against it are not controlling, because this is a contract action by it against a nondepositor. Section 3406, however, is not limited to negligence actions or to actions by a depositor. Everything we have said so far about the Bank versus Peters applies equally to the Bank versus Faux. Peters was Faux's agent; if Peters failed to exercise ordinary care, then so did Faux, and if not, not. Moreover, the Bank could not contractually disclaim its duty of ordinary care. (Cal. U. Com. Code, § 1302, subd. (b); see also Cal. U. Com. Code, § 4103, subd. (a).) But if the Bank is liable to Faux for its failure to exercise ordinary care, then there is, in effect, no overdraft in Faux's *1340 account and hence no overdraft for which Peters can be held contractually liable. Peters is, at most, a guarantor of Faux's liability.[2]
Peters argues that the trial court used the wrong burden of proof: it required him to prove the Bank's negligence, when it should have required the Bank to disprove its own negligence. As we have already discussed, however, under section 3406, subdivision (c), Peters did have the burden of proving the Bank's negligence.
Alternatively, Peters also argues that there was evidence that the Bank was, in fact, negligent. Basically, he claims it was negligent to allow Faux to make wire transfers to China totaling $468,000 when the balance in the account had historically been between $3,000 and $5,000.[3]
The California Uniform Commercial Code defines "`[o]rdinary care' in the case of a person engaged in business [as] observance of reasonable commercial standards, prevailing in the area in which the person is located, with respect to the business in which the person is engaged. In the case of a bank that takes an instrument for processing for collection . . ., reasonable commercial standards do not require the bank to examine the instrument if the failure to examine does not violate the bank's prescribed procedures and the bank's procedures do not vary unreasonably from general banking usage not disapproved by this division or Division 4 . . . ." (Cal. U. Com. Code, § 3103, subd. (a)(7).)
There was absolutely no evidence that prevailing commercial standards required the Bank to question the wire transfers. The Bank even presented some evidence that it acted in accordance with prevailing commercial standards (although that evidence went largely to its acceptance of the checks for deposit, rather than to its making of the wire transfers). Even assuming the trial court could have concluded that the Bank was negligent, in the absence of any evidence that the Bank actually violated prevailing commercial standards, it was not required to do so.
We therefore conclude that Peters has not shown that the trial court erred by issuing the right to attach order.

*1341 IV

DISPOSITION
The order appealed from is affirmed. The Bank is awarded costs on appeal against Peters.
Hollenhorst, Acting P. J., and McKinster, J., concurred.
NOTES
[1] A previous version of section 3406 (Stats. 1963, ch. 819, § 1, p. 1849) was repealed (Stats. 1992, ch. 914, § 5, p. 4346), and the current version was enacted (Stats. 1992, ch. 914, § 6, p. 4346), effective January 1, 1993. Cases decided under the previous version are not necessarily still good law.
[2] Peters has not argued that he was not liable under the written account agreement for Faux's overdrafts. We deem any such contention forfeited for purposes of this appeal.
[3] Peters has not argued that the Bank's representations that the checks had cleared bar it from recovering. (See generally Holcomb v. Wells Fargo Bank, N.A. (2007) 155 Cal.App.4th 490, 496-500 [66 Cal.Rptr.3d 142].) We deem any such contention forfeited for purposes of this appeal.