(85 South. 754)

**McCARTY v. FIRST NAT. BANK OF BIRMINGHAM.** (6 Div. 960.)

(Supreme Court of Alabama. May 13, 1920. Rehearing Denied June 30, 1920.)

**1. Banks and banking ⬤⇒148(1) — Banks bound to know signature of depositors.**

A bank is bound to know the signatures of its depositors, and the payment of a forged check, however skillfully executed, cannot be debited against a depositor.

**2. Banks and banking ⬤⇒148(3)—Depositor must examine account and vouchers, and is liable to bank for injuries caused by omission to do so.**

There is a duty on a depositor in a bank to examine his account and vouchers, and to make known to the bank any improper charges or vouchers returned, and where injury results to the bank from the failure of a depositor to do his duty in this respect, the law holds the depositor liable for such injury.

**3. Banks and banking ⬤⇒148(3) — Depositor not liable for injuries resulting to bank from failure to call for passbook.**

A depositor, who has called for a statement of his account by leaving his passbook with the bank, where it is balanced by the bank, and is ready for delivery to the depositor, along with the canceled checks charged by the bank against his account, owes the bank no duty to call for the book and the checks within a reasonable time, and he is not in the same position as to imputed knowledge of forgeries, and as to negligence with respect to their disclosure to the bank, as he would be in if he had actually received the checks and the book from the bank.

**4. Account stated ⬤⇒6(3)—No account stated before delivery of account.**

A statement of account, though prepared and ready for delivery, does not become a stated account, with legal consequences, until it is actually placed in the hands of the party to be charged, and with knowledge of its purport he has acquiesced in its correctness, and a balanced bank book could not become a stated account until after its reception by the depositor.

**5. Banks and banking ⬤⇒154(6)—Burden of proof on bank to show repayment of deposit.**

Where it appears in an action between a depositor and a bank that depositor made a certain deposit, the burden was upon the bank to show that the money deposited was paid out on the orders of the depositor.

**6. Banks and banking ⬤⇒154(8)—Payment of forged check sufficient to support finding that depositor had deposited amount paid out.**

The payment of a forged check by a bank might of itself support an inference that the amount so paid out was on deposit to the credit of the depositor, in an action by the depositor to recover the amount of the forged checks.

Appeal from Circuit Court, Jefferson County; Romain Boyd, Judge.

Action by W. C. McCarty against the First National Bank of Birmingham in assumpsit. Judgment for defendant, and plaintiff appeals. Reversed and remanded.

The plaintiff sues to recover $7,290 alleged to be due him from the bank as a balance on his checking account carried with the bank. The bank paid out the amount in question upon a series of checks, drawn in the name of the plaintiff, and shown to have been forgeries. The bank denies any liability for this money, on the ground that the plaintiff was guilty of negligence in failing to discover and report other forgeries of his checks by the same party on the same account, during a period just preceding the forgeries in question, whereby the bank was induced to pay the latter series later, and prevent it from having prompt recourse. The plaintiff, a business man of Birmingham, became a depositor of the defendant bank in January, 1915. This was his reserve account, as to which his deposits and withdrawals were in substantial sums; his regular daily checking account being kept elsewhere.

One Carney, whose social relations with plaintiff's son gave him access to plaintiff's office, began his series of forgeries against this account on March 5, 1917, drawing one or more checks each month down to Septem-

ber, when he drew September 1st a check for $800, September 10th a check for $500, and a check for a like amount on September 24th. The last check overdrew the account and led to the discovery of the forgery. The checks were all made payable to plaintiff's son, were ostensibly indorsed by him, and were presented by and paid to Jim Carney. The checks thus drawn and paid prior to July, 1917, aggregated $2,400, and this sum was repaid to plaintiff by the bank in October. Plaintiff's bank book was balanced and returned to him, with his canceled checks, on February 24, 1917. He kept the book from then until July 3, 1917, when it was sent to the bank to be balanced. It was balanced and ready for delivery to the plaintiff along with the canceled checks on July 5th following, and was placed near the bookkeeper's window, along with other similar books, to be delivered to plaintiff whenever he might call for it.

Testimony for the bank tended to show that plaintiff did not call for the book until September 4th following, on which date it was in fact delivered to his agent on call; but plaintiff placed it in his safe, without examining it or the canceled checks, and plaintiff had no actual knowledge of the forgeries until September 24th, the date of the last forged check, which overdrew his account. The bank also had no knowledge of the forgeries until then informed by the plaintiff.

Robinson, a bookkeeper at the bank, testified that when the passbooks were written up, with statements and canceled checks in them, they are placed at the window in alphabetical order. Certain business houses and firms and a few individuals have their accounts balanced every 30 days at certain times during the month. The balance of the individual accounts were only balanced when parties left their books and called for them later. The bank had no rule to require the balancing of a book at any particular time, but here was a request to have them balanced often or every 30 days. The bank did not require that rule or that request to be enforced. It is a fact that accounts ran for months or even years, without being balanced up.

Barker, another bookkeeper, testified that the custom and practice at that bank is for the customers to come to the bank and get their passbooks and written-up accounts. The bank had a form of post card that it used to mail out, saying that the statement had been there quite a while, prepared and balanced, and asking the customer to call and get it. These cards were not sent out to call attention to the books that had been lying there for an unreasonable length of time. These cards were used in cases where a great many checks had accumulated and were in the way,

and the head bookkeeper would write them a card, just to get them out of the way. The bank did not have or employ any rule as to how long passbooks should be held in the passbook window after they were written up. That was entirely at the pleasure of the customer. There was no obligation on his part to come soon or late for the books, and the bank made no protest if the customer did not come promptly.

Kitchens, the head bookkeeper, testified that the custom at the bank as to passbooks was for the customer to call for the passbook at the passbook window. There was no rule requiring the books to be balanced. They left their books at any time they wanted to, and "some books ran a year or two before they were balanced, and I have had books to come in that had not been balanced for eight or ten years." A customer would call for his book at any time that he came, and it was the bank's duty to hold it until the customer or some authorized person came for it. It is a fact that a great many passbooks were left there for months at a time after being written up. The bank never raised any objection to those customers, and if anything came up that way they were willing to correct it at most any time. The bank did not take advantage of the book being left there for any considerable length of time.

The vice president of the bank testified that the bank had no rule requiring the writing up of any book at any particular time, nor did it seek to enforce any rule about asking for passbooks after they were written up and ready for delivery by the bank. We could not compel customers to come and get their books. The bank had no system of delivery of bank books to customers by mail or messenger, especially in the city, but in some cases did send them to out of town customers.

The trial judge instructed the jury as follows:

"While it is the duty of the bank to know the signatures of its customers and depositors, the depositors also owe the bank certain duties by way of protecting the bank, and one of these duties * * * is, when its passbooks or checks are given him, to examine them, and if he finds any errors there, or forged checks, to notify the bank at a reasonable time."

To this he added:

"And I charge you that he also owes the further duty, and that is, that if he leaves his bank book to be balanced and statements rendered, it is his duty to call for his bank book and statement and canceled checks within a reasonable time thereafter; * * * and if the plaintiff in this case failed to call there in a reasonable time and without good excuse to get the book, that would be a good defense to the extent that the defendant suffered damage after the expiration of a reasonable time."

Plaintiff had a judgment for $550, apparently for the amount of the check of September 10th.

Allen & Fisk, of Birmingham, for appellant.

The court erred in the charges given. 100 Ala. 476, 14 South. 335, 27 L. R. A. 426, 46 Am. St. Rep. 80.

Cabaniss & Cabaniss, of Birmingham, for appellee.

It is a depositor's duty to examine his accounts and vouchers returned within a reasonable time, and to give the bank timely notice of any errors or discrepancies therein, and any depositor failing to do this is liable to the bank for the loss sustained for this neglect of duty. 100 Ala. 476, 14 South. 335, 27 L. R. A. 426, 46 Am. St. Rep. 80; 117 U. S. 96, 6 Sup. Ct. 657, 29 L. Ed. 811; 132 Mass. 156; 69 Tex. 38, 6 S. W. 171, 5 Am. St. Rep. 23; 51 Md. 562, 34 Am. Rep. 325; 208 N. Y. 218, 101 N. E. 871, L. R. A. 1915D, 741, Ann. Cas. 1914D, 462; 6 Pennewill (Del.) 580, 69 Atl. 607, 16 L. R. A. (N. S.) 593, 130 Am. St. Rep. 158; 109 Va. 530, 64 S. E. 950, 17 Ann. Cas. 119; 90 Minn. 478, 97 N. W. 380; 92 Cal. 14, 27 Pac. 1100, 14 L. R. A. 320, 27 Am. St. Rep. 82; 103 Mo. App. 613, 77 S. W. 1002; 124 La. 885, 50 South. 783. The bank was entitled to invoke the doctrine of equitable estoppel as to those checks paid after the depositor is chargeable with notice, if the depositor's failure to call attention to the forgeries mislead the bank in paying subsequent checks. Authorities supra.

SOMERVILLE, J. [1, 2] In the case of First National Bank v. Allen, 100 Ala. 476, 14 South. 335, 27 L. R. A. 426, 46 Am. St. Rep. 80, it was said:

"The correct principles by which the respective liabilities of the bank and depositor are determined are these: The bank is bound to know the signature of its depositors, and the payment of a forged check, however skillfully executed, cannot be debited against the depositor. From the relations the depositor and the bank bear towards each other, there is a duty also upon the depositor to examine his accounts and vouchers, and to make known to the bank any improper vouchers or charges returned, and where injury results to the bank from the failure of the depositor to do his duty in this respect, the law holds the depositor liable for such injury, the result of the depositor's omission."

This statement of the law is unquestionably based upon sound reason, and is supported by practically all the authorities, which are collected in 7 Corp. Jur. 687, § 415, and notes. The most recent case in point is that of Hammerschlag Mfg. Co. v. Imp. & Trad. Nat. Bank, 262 Fed. 266 (U. S. Cir. Ct. of Appeals), wherein the leading cases are reviewed at some length. A comprehensive and valuable discussion will be found also in National Dredging Co. v. Farmers' Bank, 6 Pennewill (Del.) 580, 69 Atl. 607, 16 L. R. A. (N. S.) 593, 130 Am. St. Rep. 158, and many cases are collected in the note to Brown v. Bank (Va.) 17 Ann. Cas. 122.

In all of the reported cases, this duty of diligence was imposed upon the depositor by reason of the fact that his passbook and canceled checks had actually been returned to him, so that notice of the forgeries was placed in his possession, and knowledge of them thereby made immediately accessible. The rationale of the rule is that, having been furnished with the means of knowledge, it is the depositor's duty to know; and, knowing, he is under the further duty of informing the bank of whatever he finds to be wrong.

[3] It is the contention of the defendant bank in the instant case, and the jury were so instructed by the trial judge, that when a depositor has called for a statement of his account, by leaving his passbook with the bank, and it is balanced by the bank, and is ready for delivery to the depositor, along with the canceled checks charged by the bank against his account, it then becomes the duty of the depositor to call for the book and the checks within a reasonable time, failing in which he is in the same position as to imputed knowledge of forgeries, and as to negligence with respect to their disclosure to the bank, as he would be in if he had actually received the book and the checks from the bank. The contention of the bank is, in short, that when the book and checks were thus prepared, pursuant to the depositor's request, and placed at the bookkeeper's window, where the depositor could get them upon demand, this was in law a constructive delivery to the depositor, with the same consequences in every respect as would have accompanied an actual delivery.

No case in point, for or against this proposition, has been cited by counsel, and, in view of our own unrewarded search for authority, we are inclined to accept the statement, made by counsel for appellant, that this case is one of first impression, at least in American courts. It is clear that a depositor is not required to anticipate errors or irregularities in his account, and particularly the payment by the bank of forged checks; and hence the law imposes upon him no duty to initiate an inquiry with respect to such matters, and, in the absence of an agreement, express or implied, between him and the bank, he is not bound to ask for a statement of his account at any time, but may rely upon the bank's observance of all of its obligations in the premises. There was no such agreement here, and the question is whether merely leaving his passbook to be balanced by the bank imposed upon plaintiff the duty of calling for the book, and the canceled checks customarily returned therewith, in a reasonable time, or, indeed, at

any time, under the penalty of releasing the bank from liability for the repetition of errors already committed.

[4] We are satisfied that the law, operating upon the mere relation of the parties, imposed no such duty upon the depositor, and, so far as we are advised, no court has ever so held. A statement of account, though prepared and ready for delivery, does not become a stated account, with legal consequences, until it is actually placed in the hands of the party to be charged, and, with knowledge of its purport, he has acquiesced in its correctness. Comer v. Way, 107 Ala. 300, 19 South. 966, 54 Am. St. Rep. 93; 1 Corp. Jur. 679, § 250. Manifestly the balanced passbook could not have become a stated account until after its reception by plaintiff on September 4, 1914. The theory upon which a depositor is required to examine his balanced passbook and his canceled checks within a reasonable time and with due care after they are returned to him by the bank, and to report errors and irregularities, if any there be, with reasonable promptness to the bank, is that, if he fails to do so, the bank may rightly presume that previous payments of checks were properly made upon the authority of the depositor, and that they have his sanction and approval, and that, so presuming, the bank may be naturally induced to make similar payment of similarly forged or unauthorized checks in the future. But where the passbook and checks have not been actually returned to the depositor, and remain in the custody of the bank, the reason of the rule entirely fails, since there can be no presumption that the depositor has acquiesced in or approved an act or a course of dealing of which he has no actual notice or knowledge, and the bank cannot justly claim to have been misled by the conduct of the depositor.

The testimony of the officers of the bank shows that the bank had no system for the delivery of balanced passbooks to its local customers, other than at the bookkeeper's window, upon the customer's call in person or by agent. But it shows, also, that the bank had no rule, and never sought to enforce any, that its customers should call for their balanced passbooks and canceled checks at any time, except as their convenience or fancy might suggest. So, very clearly, the plaintiff was under no contractual duty, express or implied, or prescribed by any regular and well-known custom, to call for his book and vouchers at any particular time, or within any period of time that might be designated as reasonable, even if it were conceded that his breach of such an agreement could be visited with the consequences here insisted upon by the bank.

No doubt the bank discharged its duty to the plaintiff by balancing his passbook, and having it and the vouchers ready for delivery at the window when called for. So far as the plaintiff's right to have a statement of account is concerned, that was in accordance with the prevailing custom, and if he failed to call for his book he could not complain of the failure of the bank to render him a statement. But that is not the question with which we have to do; and if the bank, for its own protection, desired to charge him with knowledge of its dealings with his account, and to have his assurance, express or implied, that those dealings were authorized, and might be safely repeated in the future, it could and should have rendered the statement by actual delivery of the book and vouchers to the plaintiff.

We are not insensible to the reasons so ably and persuasively presented by counsel for the bank in support of the contrary view; but, upon a very careful consideration of the question, we hold to our conclusion, as above set forth, as the sounder and better rule. It results that the trial court erred in the instruction given to the jury in this regard.

[5, 6] It is suggested by counsel for the bank that the evidence fails to show that the bank was indebted to the plaintiff in any amount at the time this suit was brought, and that, not being entitled to recover in any event, the errors assigned were harmless. This suggestion is without merit, since it appears that the plaintiff's balance on February 24, 1917, was $6,898.20, and that he afterwards deposited sums amounting to $1,500. If all of this was repaid to plaintiff, or paid out on his order, which does not appear, the burden was, of course, upon the bank to show it. Moreover, the payment of the forged checks by the bank may of itself support the inference that the amounts so paid out were on deposit to the credit of the plaintiff.

It is unnecessary to consider other questions that have been argued, since they probably will not be presented again. For the error pointed out, the judgment will be reversed, and the cause remanded for another trial.

Reversed and remanded.

ANDERSON, C. J., and McCLELLAN and THOMAS, JJ., concur.