**Louis A. SABATINO, as Ancillary Administrator of the Estate of Jose Juan D'Agostino, Deceased, Plaintiff-Appellee,**

v.

**CURTISS NATIONAL BANK OF MIAMI SPRINGS, etc., Defendant-Appellant.**

**No. 30174.**

United States Court of Appeals, Fifth Circuit.

May 24, 1971.

Rehearing Denied June 22, 1971.

Lewis Horwitz, Miami Beach, Fla., for appellant.

Louis A. Sabatino, Miami, Fla., for appellee.

Before JOHN R. BROWN, Chief Judge, and PHILLIPS * and INGRAHAM, Circuit Judges.

ORIE L. PHILLIPS, Circuit Judge:

Jose Juan D'Agostino [1] commenced this action against the Curtiss National Bank of Miami Springs, Florida,[2] a national banking corporation, on April 17, 1967.

On January 11, 1967, and prior thereto, through February 9, 1967, and subsequent thereto, D'Agostino maintained a regular checking account in the Bank, identified on the Bank records by the following:

"122–07–272 5 3–31–64
JOSE JUAN D'AGOSTINO
25 DE MAYO 1347
VICENTE LOPEZ
PROVINCIA DE BUENOS AIRES
REPUBLICA ARGENTINA"

Shortly after February 9, 1967, the Bank sent D'Agostino a statement showing the amount of checks charged to his account and deposits credited to such account during the period January 11, 1967, to February 9, 1967. There is a dispute whether a cancelled check for $18,750, charged as a debit in the state-

---

* Of the Tenth Circuit, sitting by designation.

1. Hereinafter called D'Agostino.

2. Hereinafter called the Bank.

ment, was enclosed with the statement. The other checks shown on the statement were enclosed. There is no dispute with respect to deposit credits.

In the complaint, D'Agostino alleged that on or about February 3, 1967, the Bank wrongfully paid out and charged to his account $18,750 to a person unknown to D'Agostino; that he had not written or made a check or other authorization in writing to anyone for such amount, nor did he authorize anyone else to do so for him; that on receipt of such statement D'Agostino was confined to his bed because of illness; that the Bank did not return to him or anyone in his behalf a cancelled check for $18,750; that the Bank had failed to produce a photostat of a check for such amount.

On receipt of such statement, D'Agostino, who was a citizen of Buenos Aires, Argentina, wrote a letter to the Bank protesting that the charge of $18,750 to his account was erroneous. He received no reply to such letter. The Bank did not deny that it had received the letter, nor that it failed to reply thereto, nor that it did not have such letter in its files, but it did not produce the letter at either trial of this case. (The reason there were two trials will appear infra.)

Having received no reply to his letter, D'Agostino, who was still confined to his bed because of illness, sent two of his brothers to Miami Springs to take the matter up with the Bank. When the brothers protested to the Bank that the charge was incorrect, the only explanation given by the Bank was that a check for $18,750, drawn on D'Agostino's account with the Bank, had been presented and paid by the Bank. When told that D'Agostino's check for $18,750 had been presented to and paid by the Bank, the brothers became quite excited. When advised by the brothers of the position taken by the Bank, D'Agostino commenced the instant action.

The statement sent by the Bank to D'Agostino for the period January 11, 1967, to February 9, 1967, showed a credit balance at the beginning of the period in D'Agostino's account of $12,066.06. It showed a check for $1,000 cashed on January 19, 1967, and a balance of $11,066.06; a check for $2,500 cashed on January 30, 1967, and a balance of $8,566.06; a deposit on February 1, 1967, of $10,000, and a balance of $18,566.06; a check for $750 cashed on February 2, 1967, and a balance of $17,816.06; a check for $18,750 cashed on February 3, 1967, and an overdraft of $933.94; a check for $150 cashed on February 6, 1967, and an overdraft of $1,083.94; an entry of $1,500 on February 7, 1967, under the heading "Deposits & Checks" and entry of the figure $1,500, followed by "RT" under the heading "Checks & Analysis" and the same overdraft of $1,083.94. Apparently, one $1,500 entry offset the other. The statement then showed a charge for a check for $1,500 cashed on February 8, 1967, and an overdraft of $2,583.94; a credit for a deposit of $100 on February 9, 1967, and an overdraft of $2,483.94.

The Bank offered no proof that it had at any time advised D'Agostino that when it cashed the check for $18,750 on February 3, 1967, it overdrew his account in the amount of $933.94, nor of the overdrafts caused by the payment of subsequent checks, as shown on the statement.

On June 6, 1967, D'Agostino was still ill, and proceedings were commenced to perpetuate his testimony by taking his deposition, but before it could be taken D'Agostino died. Thereupon, Louis A. Sabatino, as administrator of the estate of D'Agostino, deceased, was substituted as party-plaintiff.

Trial by jury was waived and the case came on for trial before the court, which resulted in a judgment in favor of the Bank. Sabatino appealed.

At the first trial, the administrator offered in evidence, as Plaintiff's Exhibit 6, a blue-covered book [3] used by D'Agostino for keeping a record of his deposit account with the Bank. It con-

3. Hereinafter referred to as the Blue Book.

tained the original entries made by D'Agostino, showing among other things the dates, numbers and amounts of checks he wrote on his account with the Bank. As a foundation for introducing the Blue Book, the administrator offered the testimony of one of the brothers of D'Agostino, who testified that he knew the handwriting of D'Agostino well and had observed him make entries in the Blue Book on numerous occasions; that when D'Agostino wrote a check he entered it in the Blue Book; that he entered only checks drawn on the Bank.

In its opinion on the first appeal, the court gave exhaustive consideration to the question of the admissibility of the Blue Book, and held it was admissible. See Sabatino v. Curtiss National Bank of Miami Springs, 5 Cir., 415 F.2d 632.

The court concluded it was unnecessary to consider the two other grounds urged as error by Sabatino.

The court held that the Blue Book provided some evidence that D'Agostino did not receive from the Bank the check for $18,750.

On retrial after remand, the same judge who presided over the first trial heard the case. He found in favor of the administrator and entered judgment in his favor for $18,750, with interest and costs.

The parties stipulated that the testimony of any witness given before the court at the first trial, as reported by the official court reporter, might be used by either party and considered by the court *in toto* at the second trial.

All of the testimony and exhibits introduced at the first trial were offered and received at the second trial. In addition thereto, Sabatino, in his capacity as administrator and counsel for D'Agostino introduced the Blue Book, and he personally testified as to the physical appearance of D'Agostino's two brothers. In addition to the testimony and exhibits introduced at the first trial, the Bank introduced as exhibits its records of D'Agostino's account and the testimony of Cush A. McDonald, Jr., a vice-president and cashier of the Bank, who pointed out discrepancies between the Bank's records and D'Agostino's records in the Blue Book. It also introduced as an exhibit at the second trial a summary of such discrepancies, prepared by McDonald.

We have not been provided with a transcript of the record and testimony at the first trial, except as it is in a small part reflected in the appendix. We have all of the original exhibits. Sabatino, in his capacity as administrator and counsel, in his statement of facts in appellee's brief in the instant appeal, adopted and set out the acts as stated by this court in its opinion in Sabatino v. Curtiss National Bank, supra. And the Bank, in its reply brief, in nowise challenged the accuracy of such statement of facts made by this court. Hence, we have relied on such statement by this court as an accurate statement of the facts established by the testimony and exhibits introduced at the first trial and reintroduced at the second trial.

The trial court, at the second trial, did not attribute too much weight to the entries made by D'Agostino in the Blue Book. While part of the writing in the Blue Book is in Spanish, the check numbers, the day of the month and year when checks were written, and the amount of each check appear in Arabic numerals as do the dates and amount of deposits, and there is no difficulty in locating in the Blue Book the entries made therein by D'Agostino in his own handwriting, covering the period from January 11, 1967, to February 9, 1967, the period covered by the statement on which the $18,750 check was entered as a debit. Recorded in the Blue Book in D'Agostino's handwriting are all of the checks reflected on the statement, except the check for $18,750, and the date and amount of each check.

Except for the check for $18,750, the largest check reflected on the statement is for $2,500 and the smallest is for $150. The $18,750 check is more than seven times the amount of the $2,500 check.

It would seem very unlikely that D'Agostino would enter the small checks and overlook entering a check for $18,-750, especially when it created an over-draft, if in fact he issued such check.

The Blue Book contained entries of checks issued by D'Agostino on February 9, 1967, but they could not have cleared in time to be included on the statement for the period ending February 9, 1967.

The Bank sought to attack the credibility and accuracy of the entries made by D'Agostino in the Blue Book by the witness Cush A. McDonald, Jr. He testified that the bank records of D'Agostino's account showed it paid a substantial number of checks not recorded in the Blue Book; that entries in the Blue Book showed deposits not reflected by the bank records; that the bank records showed amounts of deposits credited to D'Agostino's account not reflected in the Blue Book; and that there were discrepancies between the amounts of checks and deposits shown by the bank records and the corresponding entries thereof in the Blue Book.

While the last entry in the Blue Book, no doubt due to D'Agostino's illness, was on February 9, 1967, the witness, in his zeal to show omissions in the Blue Book, testified to omissions from it of deposits shown by the bank records to have been made on February 17, February 19, and February 22, 1967.

While, admittedly, D'Agostino was not a proficient bookkeeper, the fact remains that he entered every check issued during the statement period, except the check for $18,750, and we think the facts we will hereafter develop will show why no entry of that check was made by D'Agostino.

Furthermore, we shall presently show some serious errors made by the Bank, with respect to the handling of the $18,-750 check and other items.

The testimony of the witness for the Bank, B. C. Lancaster, was taken by deposition about July 1, 1967. It was to the following effect:

In 1967 he was a vice-president of the Bank, in charge of collections. However, for a period of about a month, beginning in late January and ending in the latter part of February 1967, he was in charge of the International Department of the Bank while the regular officer of that department was on vacation in Europe. Shortly before the time he testified, he had left the Bank to accept new employment in Houston, Texas.

On or about February 3, 1967, a man, whose name is not mentioned by any of the witnesses nor reflected in the record, presented a check for $18,750, purportedly signed by D'Agostino, and requested payment thereof in cash.

We digress to state that the record reflects no facts about this man, except that he was dressed in a suit, wore a shirt and necktie, was of stocky build, was about 5 feet 10 inches tall, wore sunglasses of the type used by airplane pilots, spoke broken English, and stated that he was about to embark for South America and carried an Argentine passport.[4]

George Galick, called as a witness on behalf of the plaintiff, testified that on February 3, 1967, he was head teller of the Bank; that on that date he cashed a check for $18,750; that he did not recall on what account the check was drawn; that on the morning of that day and before noon Lancaster called him and stated that he had a customer with a check for $18,000, plus, and asked him to have the funds ready to cash the check; that he got the funds ready, and about 2 p. m. of that day Lancaster came down "with the man, the customer" and the check for $18,750; that Lancaster had initialled the check, showing that it was proper for payment, and that he gave the man $12,700 in 100-dollar bills and $6,050 in 50-dollar bills.

4. We will hereafter refer to him as "the man" where the context shows we are

referring to the man who presented the check for payment.

Returning to Lancaster's testimony, Lancaster obtained D'Agostino's signature card from the signature file. He had had considerable training and experience in identifying handwriting. He compared the signatures on the check and on the card and concluded that they matched. Lancaster then went back to the man and asked him for identification. The man gave him an Argentine passport. Lancaster then asked the man to endorse the check. The man complied with Lancaster's request and endorsed the check. Lancaster then compared the endorsement signature on the check with the signature on the passport and concluded they were made by one and the same person. Lancaster said he was sure he compared the face of the man with the picture on the passport, because that was what he always did, and that he was satisfied that the picture on the passport was the picture of the man who presented the check.

The foregoing apparently occurred in the forenoon of February 3, 1967, because in the forenoon of that day Lancaster had notified George Galick that he had a customer with an $18,000, plus, check and requested Galick to have the funds ready to cash the check.

After placing his initials on the check, indicating that it was proper to pay it, at 2 p. m. on February 3, 1967, Lancaster took the man to the head teller, Galick, and Galick gave the man the amount of the check in currency. After the man counted the money and acknowledged it was correct, Lancaster gave the man a zipper bag in which to carry the money. The man put the money in the bag and left the bank.

Lancaster did not compare the signature on and the writing in the body of the check for $18,750 with three checks theretofore written and signed by D'Agostino, cashed by the Bank on January 19, January 30, and February 2, 1967, and in possession of the Bank on February 3, 1967, which he could quickly have ascertained by merely looking at the Bank's ledger of D'Agostino's account.

We think under the circumstances ordinary prudence would have prompted him to make such additional comparisons, even if it would have required running three days' cancelled checks through the sorting machine.

If he looked at or inquired as to D'Agostino's account on February 3, 1967, as he ordinarily would have done before authorizing the cashing of a check for $18,750, he would have known it would create an overdraft in excess of $900. That is another circumstance that ordinary prudence would have prompted further inquiry than he made before authorizing the cashing of the check.

There is a cogent reason why Lancaster should have compared the handwriting in the body of the $18,750 check with D'Agostino's handwriting in the body of the three D'Agostino checks in the Bank's possession. While the signature of D'Agostino had some unusual characteristics, it was wholly illegible as to the individual letters in his name. The letters in his handwriting of course have unusual characteristics. Hence, it would have been enlightening to have compared the writing in the body of the $18,750 check with D'Agostino's handwriting in the body of such three checks to see if the characteristics of the letters in D'Agostino's handwriting in the body of such three checks were present in the letters in the writing in the body of the $18,750 check.

If Lancaster had the training and experience in the identifying of handwriting he testified he had, surely he knew the help such comparisons would have given him.

The $18,750 check had an unusual history in the Bank. First was the fact that the man who presented the check was a foreigner, had an Argentine passport, was going to travel from Miami to Argentina with $18,750 in currency on his person, and was going to leave at once. Lancaster knew that before he approved the check for cashing. We think it an unusual circumstance that a man would want a check for $18,750 cashed in

currency, with the intention of carrying it on his person on a trip from Miami, Florida, to Argentina, South America.

Galick's testimony showed clearly that Lancaster had determined that it would be proper to cash the check before noon on February 3, 1967, because before noon of that day Lancaster called Galick and asked him to have funds ready in cash to pay an $18,000, plus, check, and it was 2 p. m. of the same day when Lancaster brought the man to Galick to cash the check. Hence, there was ample time for Lancaster to have called D'Agostino by long distance telephone from Miami to Buenos Aires and inquired as to the authenticity of the check. Ordinary diligence, we think, under all the existing circumstances, would have prompted him to do so when the check was presented to him by a stranger and foreigner, who was leaving for South America immediately, who desired to have the check paid in cash, and who intended to carry the money on his person to South America.

The check, after the payment thereof, was properly recorded on the head teller's adding machine tape and the teller's total for the day balanced. The check then passed to the bookkeeping department and the bookkeeping department erroneously posted the check, necessitating further handling and a correct posting of the check.

The next step in the Bank's operation after the posting of the check was to microfilm the check. It had been the custom of the Bank for at least four years prior to the beginning of this action to make a microfilm of every check that "crossed its books" for the protection of itself and its customers.

A microfilm of every check paid by the Bank on February 3, 1967, was present in regular order in the microfilm file, except the check for $18,750. For some unexplained reason, no microfilm of the $18,750 check was in the microfilm file. The Bank made a diligent search to find the microfilm of the $18,750 check and was unable to find one.

Nobody in the Bank testified to ever having seen the $18,750 check after it left the bookkeeping department.

After the microfilming of checks was concluded, it was the regular practice of the Bank to put the checks in storage until they were put through a sorting machine, to be sent out with the customers' monthly statements.

The testimony of Edna M. Hancock was to the following effect:

That it was her duty to obtain the depositors' copies of the ledger sheets from the ledgers, fold them and place them in stacks, preparatory to mailing them with the cancelled checks to the customers. In February 1967, the Bank used a machine which sorted out each customer's cancelled checks. She would obtain the cancelled checks of a particular customer and the statement of that customer's account. She would count the number of checks debited on the customer's statement and the number of checks which came to her for that customer from the sorting machine, and if the two numbers were the same she made no further examination, but placed the checks and statement in an envelope and sealed it, preparatory to mailing.

When asked if she remembered a check for $18,750, she stated she did not "check each check. Just counted the total number of checks." She further testified:

"Q. And you, of course, now, today, assume that this operation was performed correctly? A. Right. It says right down here in my handwriting, 'corrected statement.'

"Q. So, what does that mean? A. It means that was corrected statement.

"Q. Well, I do not understand you. Not all of these statements have your handwriting on them that say corrected statement. A. No, they don't. This is the last statement.

"Q. Why does it say corrected statement? A. I don't know.

"Q. Why did you write it on? A. I don't know. It was just given to me

and it was done as a corrected statement."

The second sheet of Sabatino's Exhibit 4, a statement of D'Agostino's account from January 11, 1967, to February 9, 1967, shows why a corrected statement was made. It does not reflect a debit for a $2,500 check paid by the Bank on January 30, 1967, and consequently does not reflect an overdraft in excess of $900, if the $18,750 check was genuine and D'Agostino was chargeable therewith, and overdrafts resulting from the payment of two other checks on February 6, 1967, and February 8, 1967, if such $18,750 check was genuine and D'Agostino was chargeable therewith.

On such second sheet of Exhibit 4, are notations written in red ink, as follows: "2,500.00 — Jan. 30" and "remake 2–16 Melba."

The first sheet of Sabatino's Exhibit 2, on which Edna M. Hancock noted "corrected statement," shows a debit for a $2,500 check, cashed on January 30, 1967; an overdraft in red figures of $933.94 on February 3, 1967, when the debit of $18,750 for the disputed check was entered; the overdrafts in red figures when two checks were cashed on February 6, 1967, and February 8, 1967, and the overdraft in red figures when credit for a $100 deposit was entered on February 9, 1967.

If the $18,750 check was in fact returned to D'Agostino—and he denied in his complaint that it was—it is almost certain that he would have stated in his letter to the Bank that the $18,750 check which was returned with his statement was not issued or signed by him, and that his purported signature thereon was a forgery, yet the Bank, which did not deny it received and still had such letter, did not see fit to introduce it into evidence. It would be strange for it not to do so, if it acknowledged that D'Agostino had received the $18,750 check.

The evidence of the witness, Hancock, fell far short of proving that the $18,750 check was in fact returned to D'Agostino with the statement.

If, when she counted the debits for checks cashed on the corrected statement, she made a mistake and her count was one less than the corrected statement showed, or if she counted the debits on the erroneous statement before the corrected statement was given to her—and she testified that she did not know why the corrected statement was made and that it was the last statement, indicating she had an earlier one—then the debits for checks cashed and the number of checks would have been the same, even though she did not have a check for $18,750. Or, if she made a mistake in counting the checks and the count was one more than the number of checks she actually had and enclosed with the statement in the envelope to be mailed to D'Agostino, a like result would have followed.

We think it is a fair inference from a consideration of all the surrounding facts and circumstances that the check was lost after it was posted the second time and never reached the employees whose duty it was to microfilm the checks.

Usage is particularly important in the field of banks and banking.[5]

■ Absent instructions or an express agreement to the contrary, general customs and usage of the banking business may have a binding effect between banks, and between a bank and the person with whom it deals.[6]

5. Henderson v. Henderson, 9 Cir., 109 F. 2d 863, 866.

6. Fischer v. First National Bank, 55 Idaho 251, 40 P.2d 625, 626; Taylor v. First Nat. Bank of Minneapolis, 119 Minn. 525, 138 N.W. 783, 784; Spokane Valley State Bank v. Lutes, 133 Wash. 66, 233 P. 308, 311; Engstrom v. Wiley, 9 Cir., 191 F.2d 684, 687; See Cooke v. Commercial Bank of Miami, Fla.App., 119 So.2d 732, 735, where the court recognized the rule, but refused to apply it because it was contrary to a Florida statute.

■ Customs and usages established by a particular bank are binding in transactions with its customers.[7]

■ It is a well established and well known general custom of banks, both state and national, in Florida and elsewhere in the United States, and of the (appellant) Bank to send to each of their checking account depositors once each month a statement covering a period of approximately one month, showing credits given for deposits made by the depositor and debits made for checks drawn on the bank by the depositor and paid and cancelled by the bank during such period, and to send to the depositor with such statement such cancelled checks.

D'Agostino, because of such custom and his long course of dealing with the Bank, during which it followed such custom, had the right to have all of the checks drawn by him on his account and paid and cancelled by the Bank during the period covered by each monthly statement returned to him with the statement.

There is authority for holding that at common law it is the duty of a bank to a checking account depositor to return to him each check which it has paid and cancelled and charged to his account, to afford the depositor evidence of the satisfaction of the obligation the check was given to discharge. Van Dyke v. Ogden Savings Bank, 48 Utah 606, 161 P. 50, 54.

However, we prefer to base our holding on the general custom followed by the Bank and its long course of dealing with D'Agostino, as stated above.

■ A bank receives a deposit of funds on the implied condition that it will disburse them on an order or check of the depositor himself or someone authorized to act for him.[8]

We hold that the evidence, considered in its entirety, fully supports the conclusion that the $18,750 check was lost by the Bank and was not returned by it to D'Agostino; and that Sabatino, as such administrator, clearly carried his burden to establish those facts.

We summarize some of the facts on which we base that holding.

A microfilm of the $18,750 check was not found in the microfilm file. Microfilms of all other checks paid by the Bank on February 3, 1967, the day the $18,750 check was paid, were found in the microfilm file in regular order. The Bank made a thorough and extensive search for a microfilm of such check and did not find one.

There was no evidence that anyone in the Bank saw such check, after it left the bookkeeping department.

When D'Agostino received the statement from the Bank for the period January 11, 1967, to February 9, 1967, he immediately wrote the Bank, protesting that the charge against him of $18,750 on the statement was erroneous. Had the check for $18,750 been enclosed with the statement sent to D'Agostino, he most certainly would have referred to it in his letter, and in effect stated that he did not write such check and that his purported signature thereon was a forgery. The Bank did not deny that it received his letter nor that it was not still in its possession, but it did not offer the check in evidence at the trial. Instead, it sought to prove that it mailed the check to D'Agostino by the inconclusive evidence of its employee, Hancock.

As stated above, if D'Agostino had received the $18,750 check with the statement, he certainly would have referred to it in his letter of protest, and the Bank would have offered the letter as con-

7. Bank of the Metropolis v. New England Bank, 1 How. 234, 240, 11 L.Ed. 115; Lincoln & Kennebeck Bank v. Page, 9 Mass. 155, 157.

8. Dalmatinsko, etc. v. First Union Trust and Savings Bank, 268 Ill.App. 314, 320;

Parker-Smith v. Prince Mfg. Co., 172 App.Div. 302, 158 N.Y.S. 346, 348; Beech-Nut Packing Co. v. National City Bank of New York, 149 Misc. 682, 268 N.Y.S. 51, 54.

clusive evidence that the check had been returned to him.

■ Counsel for the Bank argue that the burden of proof never shifts and when the party having the burden of proof makes a prima facie case, the burden of proof does not shift to the opposite party, but he is only required to come forward with some evidence to rebut such prima facie case. That is a generally accepted rule and we agree with it.

In our consideration of this case, we fully recognized that at all times during the trial the burden was upon Sabatino, as administrator, to establish that the $18,750 check was not returned to D'Agostino by the Bank. As stated above, we hold he fully met that burden and that it was not overcome by evidence introduced at the trial. However, when it was clearly established by the evidence that the Bank did not return the cancelled $18,750 check to D'Agostino, and either failed to make or to preserve a microfilm thereof, there was no way Sabatino could submit either such check or a microfilm thereof, together with proven genuine signatures and writings of D'Agostino, to handwriting experts and prove, if such was the case, that the signature on the check was not D'Agostino's and was a forgery. Even if D'Agostino had lived and could have testified that the signature on such check was not his, but was a forgery, a good lawyer would have endeavored to support D'Agostino's testimony with the testimony of experts, but would have been unable to do so.

■ Having placed Sabatino, as administrator, in a position where he could not obtain such evidence of handwriting experts, by reason of its failure to perform its legal duty to return the cancelled $18,750 check to D'Agostino and by failing either to make or to preserve a microfilm thereof, we think the burden was on the Bank, by reason of its own derelictions, to prove that the signature on such check was D'Agostino's and not a forgery thereof. We have failed to find a reported case where there were present peculiar facts and circumstances like those present in the instant case, but we think such facts and circumstances justify our conclusion that such burden of proof was on the Bank.

To meet that burden, the Bank offered the testimony of Lancaster.

We think Lancaster, in his investigation to ascertain if the signature on the $18,750 check was D'Agostino's, did not exercise ordinary prudence in view of the facts that the check was presented to the Bank by a foreigner and a complete stranger, who spoke broken English, who wanted the proceeds in cash, who said he was leaving immediately for South America and was going to carry $18,750 on his person, and because of other facts we shall now relate. The letters in D'Agostino's signature were illegible and there was no way to compare the characteristics of the letters in his signature and the letters in the signature on the $18,750 check, or to compare the characteristics of the letters in the signature with genuine writings of D'Agostino. But D'Agostino's handwriting, except in his signature, was quite legible and the characteristics of the letters in the body of the $18,750 check could have been compared with the characteristics of the letters in the body of checks written by D'Agostino, three of which were present in the Bank on February 3, 1967, and Lancaster could have easily ascertained the latter fact when he inquired as to D'Agostino's balance, as he surely did before he approved the cashing of an $18,750 check. Such a comparison would have been very enlightening to Lancaster if he had the training and experience he testified he had in examining and comparing handwritings to ascertain if they were made by the same person.

We think Lancaster's testimony was greatly weakened by his failure to compare the signature on and the writing in the body of the $18,750 check with the signature on and the writing in the body

of the three checks previously written and signed by D'Agostino. If then he had the slightest doubt about the signature on the $18,750 check being D'Agostino's he could have called D'Agostino by long distance telephone and ascertained if he wrote and signed the $18,750 check. He had ample time to do so before he directed the head teller to cash such check. We think the facts with respect to the person presenting the check and what he intended to do when he received the proceeds should have prompted Lancaster to take every precaution reasonably possible.

 A bank on which a check is drawn by its depositor is charged with the knowledge of the depositor's signature.[9] This has been the rule in the majority of jurisdictions at common law, since Price v. Neal, 3 Burr. 1354, decided by Lord Mansfield in 1762, and has continued in force under the Negotiable Instruments Law.[10]

 A bank pays a forged check at its peril and it will be considered paid out of its own funds,[11] so it has no right to charge such check to the depositor's

account on which it purports to be drawn.[12]

Finally, we do not think, under the existing facts and circumstances stated above, that Lancaster exercised ordinary prudence when he did not do more than compare the signature on the $18,750 check with D'Agostino's signature card. He could also have compared the writing in the blanks of the $18,750 check and the signature thereon with signatures of other checks and writings thereon, issued by D'Agostino, which were then in the possession of the Bank, even if it meant running them through the sorting machine. In addition, he had ample time to call D'Agostino by long distance telephone from Miami to Buenos Aires and ask him whether he had signed and issued such check for $18,750.

The fact that the man's signature on the passport corresponded with his signature endorsing the check only showed he was using his correct name. It did not in any way show that the signature on the $18,750 check was D'Agostino's.

We agree with the conclusion of the trial court, and the judgment is accordingly affirmed.

9. Maitland, Coppell & Co. v. Laredo Nat. Bank, 5 Cir., 296 F. 867, 869; Citizens Bank of Booneville, Arkansas v. National Bank of Commerce, 10 Cir., 334 F.2d 257, 258; Greene v. Cuykendall, Sup., 40 N.Y.S.2d 801, 808.

10. Security Commercial & Savings Bank of San Diego v. Southern Trust & Commerce Bank, 74 Cal.App. 734, 241 P. 945, 947; Greene v. Cuykendall, Sup., 40 N. Y.S.2d 801, 808.

11. Union Tool Co. v. Farmers' & Merchants' Nat. Bank, 192 Cal. 40, 218 P. 424, 426; Basch v. Bank of America Nat. Trust & Savings Ass'n, 22 Cal.2d 316, 139 P.2d 1, 5; Wichita Frozen Foods Co. v.

Union National Bank of Wichita, 190 Kan. 539, 376 P.2d 933, 936; Edgerly v. Schuyler, Fla.App., 113 So.2d 737, 740; Miami Beach First National Bank v. Edgerly, Fla., 121 So.2d 417, 419.

12. Maitland, Coppell & Co. v. Laredo Nat. Bank, 5 Cir., 296 F. 867, 869; McCarthy v. First Nat. Bank of Birmingham, 204 Ala. 424, 85 So. 754, 756; Midland Savings & Loan Co. v. Tradesmen's National Bank, 10 Cir., 57 F.2d 686, 689; Maurmair v. National Bank of Commerce of Tulsa, 63 Okl. 283, 165 P. 413, 414; Frankini v. American Nat. Trust & Savings Ass'n., 31 Cal.App.2d 666, 55 P.2d 232, 233.